**STATE of Minnesota, Respondent,**

v.

**Richard C. GRIFFIN, Appellant.**

**No. C2–82–604.**

Supreme Court of Minnesota.

July 15, 1983.

C. Paul Jones, Public Defender, and Mark F. Anderson, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Rick Osborne, J. Michael Richardson and Beverly J. Wolfe, Asst. County Attys., Minneapolis, for respondent.

TODD, Justice.

Defendant was found guilty by a district court jury of a charge of simple robbery, Minn.Stat. § 609.24 (1982), and was sentenced by the trial court to 30 months in prison, which is the presumptive sentence for this offense (a severity level VI offense) by a person with defendant's criminal history score (three). On this appeal from judgment of conviction defendant seeks a new trial on either or both of two grounds: (1) alleged error in refusing to suppress certain

evidence on Fourth Amendment grounds and (2) alleged error in refusing to suppress identification testimony on due process grounds. Alternatively, defendant, claiming that the state failed to prove that his criminal history score was three instead of two, seeks a modification of his sentence from 30 months executed to 27 months stayed, which is the presumptive sentence for the offense by a person with a criminal history score of two. We affirm.

The victim in this case was a 60-year-old woman. She was waiting to catch a bus in south Minneapolis at about 12:45 a.m. on December 1, 1981, when a young man approached her, hit her in the face, grabbed her purse and fled. Police followed the robber's tracks in the freshly fallen snow to the rear of a nearby rooming house, where they found only one set of tracks entering the house and none leaving. The landlady, who answered the front door, told police that she had a roomer named Richie Griffin who fit the description which police gave her. Police went to the rear door, where the footprints were, and knocked. Defendant answered the door. The officers, who noted that defendant's hair was wet, told him why they were there, and defendant replied that he had been there all evening. The officers then had other officers bring the victim to the back door to look at defendant, and she immediately and positively identified him as her assailant.

After arresting defendant in the hallway, the officers gave defendant a *Miranda* warning, which he said he understood, and asked him which room was his. He indicated that it was the one with the open door, something which was obvious anyhow.

At the omnibus hearing and at trial Officer Theodore Boran testified that the reason they asked which room was defendant's room was that they wanted to get defendant's shoes for him. He added that defendant also had said that he wanted his jacket. He testified that before he entered he looked into the room and saw a brown coin purse and a flashlight on the bed; he knew that a coin purse was among the items which the victim had reported missing. He testified that after he entered the room he saw, through the open closet door, a lady's purse on the floor in the corner of the closet; the purse was open and appeared to him to have been "gone through." He testified that he also saw a jacket and a dark-colored stocking cap, which were wet.

Officer Paul Heeren did not testify at the omnibus hearing but did testify at trial. His testimony differed somewhat from that of Officer Boran. He testified that after he saw the coin purse and the jacket, he walked in to examine them. He testified that once he was inside he examined the jacket, finding that it was wet. He testified that he then saw the cap, which was wet, and the purse in the open closet. He testified that they asked the victim if she could identify the items and she did. He testified that the decision to get the shoes and the coat was "probably" made after they had entered the room and before they took defendant out of the house.

The officers let the victim take the coin purse and the purse. They compared the soles of the shoes with the tracks left by the assailant and found them to be very similar. The officers seized the cap at the house but apparently let defendant wear the jacket and the shoes until he got to the station. At some point, apparently after the purse was seized, defendant spontaneously said that he had not taken the purse, that his "roommate, John Holmes," just came to the door, dropped his things off and left.

The case was assigned for investigation to Lieutenant James Heimerl of the police department later that morning. He talked with the victim on the telephone, who said that she had checked her purse and discovered that her rings were missing. (Officer Boran had seen the rings on the dresser in defendant's room but had not seized them or mentioned them in his report because the victim had not mentioned them in her statement of what was missing.)

Later that morning, Lieutenant Heimerl gave defendant another *Miranda* warning and questioned him at the jail. Defendant said that he had been watching television with the landlady and a fellow tenant the

entire evening of the 30th until the police came and that no one else had come or gone. He testified that later in the conversation defendant said that this was not the truth and claimed that what really happened was that his friend, John Holmes, who he said looked like him and lived somewhere in north Minneapolis, had come running in. He said that Holmes had removed his clothes, put on others, thrown some stuff and run. Asked about the rings, defendant said that there were not any and that if there were Holmes had taken them with him.

Lieutenant Heimerl then made an appointment to see the landlady. She had entered defendant's room after the police left because she heard defendant's television still on and saw a light coming from under the door. Once inside, she saw the rings on the dresser. When Lieutenant Heimerl mentioned the rings, she told him what she had seen. He told her that he was going to get a search warrant, which he did. While he was getting the search warrant, she got the rings and put them in an envelope for safekeeping. When he returned the following morning with the warrant, she took him to the room, opened the envelope and put the rings where she had found them, and he seized them.

The trial court ruled at the omnibus hearing that the warrantless arrest was clearly proper and that it was proper for the officers to look through the open door into defendant's room. He also ruled that it was proper for the police to enter the apartment to get the shoes but that they should have gotten a search warrant before seizing the cap, jacket, shoes, purse and coin purse. However, before trial, he reversed himself and ruled that the seizure of the items in the room was proper pursuant to the legitimate entry into the room to get the shoes.

At trial the victim positively identified defendant, and the other evidence that we have summarized was admitted. Defendant's landlady testified that she played bingo with a fellow tenant and did not return until after midnight. She testified that by the time the police came over an hour later, the footprints that she and this fellow tenant had made in returning from bingo had been snowed over.

The only issue at the sentencing hearing was whether defendant's criminal history score should be two or three. Defendant conceded that he had two criminal history points, one for attempted robbery in Illinois in 1978 and one for committing the present crime while on parole. He disputed the state's contention that he should also receive one point for an Illinois felony escape conviction. He argued that the state had not provided certified documentation of that conviction and that the conduct underlying the conviction did not constitute the felony crime of escape in Minnesota. It is undisputed that the felony escape conviction in Illinois was based on defendant's failure one weekend to return and spend the weekend in jail, as he was required to do by the terms of his probation. The trial court ruled that defendant's criminal history score was three, rather than two, which meant that defendant's presumptive sentence was 30 months executed rather than 27 months stayed.

1. Defendant's first contention is that the trial court prejudicially erred in refusing to suppress the purse, coin purse, cap, jacket and shoes on Fourth Amendment grounds.

■ An appropriate starting point for an analysis of this issue is with the fact that the so-called "plain view" exception to the warrant requirement is a rule dealing with the seizure of evidence. It permits a police officer "to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 816, 70 L.Ed.2d 778 (1982), citing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The "plain view doctrine" is not as broad a rule as some people think and must not be applied carelessly. The following relevant discussion from *State v. Yaeger,*

277 N.W.2d 405, 407 (Minn.1979), bears repeating:

As Judge Moylan points out in his article on the doctrine, "The hardest conceptual problem attending the plain view doctrine is to grasp that it is not a universal statement of the right of a policeman to seize after seeing something in open view; it is rather a limited statement of that right in one of several instances—following a valid intrusion." Moylan, *The Plain View Doctrine*, 26 Mercer L.Rev. 1047, 1096. Moylan isolates two types of observations of items in open view which are not covered by the plain-view doctrine. The first is the nonintrusive situation, where the police see seizable evidence in open view in a constitutionally nonprotected area, e.g., an open field. In this situation if the police seize the evidence they do it not by virtue of the plain-view doctrine, but because "there is no constitutional provision to gainsay the seizure." Id., p. 1097. The second situation is the preintrusive situation, where police stand on the outside of a constitutionally protected area and look in and see seizable items in open view. In this situation the police may seize the evidence without a warrant only if there is "an additional legal predicate for the intrusion necessary to effect a seizure." Id., p. 1100.

The real issue in this case is whether the police had a valid reason for crossing the threshold of defendant's room without a warrant after validly arresting him in the common hallway of the building. The issue is discussed at 2 W. LaFave, Search and Seizure § 6.4(a) (1978 and Supp. 1983). The general issue was also addressed recently in *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). In *Chrisman* a campus policeman at a state university saw a student, Overdahl, leave the dormitory carrying a bottle of gin, something which was illegal if the student was under 21. The officer stopped Overdahl and asked to see some identification. He said that it was in his dormitory room and asked the officer if he could get it. The officer said that under the circumstances he would have to accompany him, to which Overdahl replied "O.K." The officer remained in the open doorway after Overdahl entered the room. From that position he saw Overdahl's roommate, Chrisman, place a small box in the room's medicine cabinet and he saw seeds and a small pipe on a desk. From his training and experience, he concluded that the seeds were marijuana seeds and the pipe was a marijuana pipe. He entered the room and seized the seeds and pipe, gave the two men a *Miranda* warning and after obtaining a waiver, asked the two if they had other drugs in the room. Chrisman then handed the officer the small box, which contained marijuana and cash. A subsequent consensual search led to the discovery of some more marijuana and some L.S.D. By vote of 6 to 3, the United States Supreme Court reversed the Washington Supreme Court, which had held that the officer's entry into the room to examine the seeds and the pipe was illegal. The opinion, by Chief Justice Burger, stated that every arrest must be presumed to present a risk of danger to the officer and that the officer therefore was justified in properly supervising the arrestee by monitoring his movements. The court reasoned that if the rule were otherwise, police might never permit an arrestee to return to his residence, no matter how legitimate the arrestee's reason for wanting to do so. The court then reasoned as follows:

It follows that Officer Daugherty properly accompanied Overdahl into his room, and that his presence in the room was lawful. With restraint, the officer remained in the doorway momentarily, entering no farther than was necessary to keep the arrested person in his view. It was only by chance that, while in the doorway, the officer observed in plain view what he recognized to be contraband. Had he exercised his undoubted right to remain at Overdahl's side, he might well have observed the contraband sooner.

\*     \*     \*     \*     \*     \*

His right to custodial control did not evaporate with his choice to hesitate

briefly in the doorway rather than at some other vantage point inside the room. It cannot be gainsaid that the officer would have had unrestricted access to the room at the first indication that he was in danger, or that evidence might be destroyed—or even upon reassessment of the wisdom of permitting a distance between himself and Overdahl.

We therefore conclude that, regardless of where the officer was positioned with respect to the threshold, he did not abandon his right to be in the room whenever he considered it essential. Accordingly, he had the right to act as soon as he observed the seeds and pipe. This is a classic instance of incriminating evidence found in plain view when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an individual's area of privacy. The Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances.

455 U.S. at 7–9, 102 S.Ct. at 818.[1] The court concluded that the seizure of the marijuana and the pipe was lawful and that all that followed was also lawful.

■ We believe that *Chrisman* controls this case. It is true that Officer Heeren testified at trial that it probably was not until after he entered the room that the decision was made to get the shoes and coat for defendant to wear to the station. However, this testimony was contrary to Officer Boran's testimony at the omnibus hearing, testimony on which the trial court relied. More significantly, it does not alter the fact that the police would have had to enter the room eventually in order to get the shoes and coat even if Heeren had not entered earlier, if that is what he did.[2] At that point the seizure of the items seen in plain view clearly would have been justified under the *Chrisman* case. Thus, even if we

were to rely on Heeren's testimony rather than Boran's testimony, the seizure of the items still was valid.

■ 2. Defendant's next contention is that the trial court prejudicially erred in refusing to suppress the eyewitness identification testimony on due process grounds. This contention is without merit. The victim had a sufficient opportunity to view the robber, since he was pacing suspiciously in a fairly well-lighted area for about a minute or two before he approached her and struck her. Her description of the robber fit defendant so well that when the police relayed it to defendant's landlady, she replied that she had a roomer that fit the description, namely, defendant. The victim positively identified defendant when her memory of the robber's face was fresh. We conclude that there was no "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Lloyd,* 310 N.W.2d 463 (Minn.1981); *State v. Hardy,* 303 N.W.2d 57 (Minn.1981); *Jackson v. State,* 269 N.W.2d 23 (Minn.1978).

3. Defendant's final contention is that the trial court erred in finding that his criminal history score for sentencing purposes was three, not two.

■ Defendant argues first that the conduct underlying the Illinois felony escape conviction would not support a conviction for a felony escape in Minnesota. This argument is answered by our decision in *State v. Beito,* 332 N.W.2d 645 (Minn.1983), in which we held that a person who is serving probationary jail time is guilty of felony escape if he intentionally fails to return to jail after being temporarily re-

---

1. In a footnote, the court distinguished the case where "an officer, who happens to pass by chance an open doorway to a residence, observes what he believes to be contraband inside." 455 U.S. at 9, n. 5, 102 S.Ct. at 818, n. 5.

2. Defendant argues in his brief that instead of entering the room the officers should have given

defendant the choice of walking in his stocking feet through the snow to the car. Defendant argues that if he refused either to let them enter his room or to walk in his stocking feet, the officers could have carried him to the car. We are not persuaded by this argument.

leased pursuant to the Huber Work Release Law.

 Defendant's alternative argument is that the trial court should have required the state to produce a certified copy of defendant's Illinois escape conviction. Defendant argues that at a minimum we should remand to the trial court for a supplemental hearing in which the state would be required to produce a certified copy of defendant's conviction. In relying on the Illinois escape conviction without requiring a certified copy, the trial court stated that it was very difficult, if not impossible, to get any documents from Cook County, Illinois, particularly a certified copy of a conviction. He then said that although there was not a certified copy of the conviction in this case, there was considerable documentation (which is appended to defendant's brief) and that that documentation convinced him that defendant had been convicted of the escape.

In *State v. Piri,* 295 Minn. 247, 204 N.W.2d 120 (1973), we held that if the defendant placed his prior record in issue at a hearing to determine whether or not to sentence him as a dangerous offender, then the trial court had to adjourn the hearing and require the prosecutor to produce evidence to establish by a fair preponderance of the evidence the validity of the prior convictions, the fact that the defendant was the person involved, and that the crimes constituted felonies in Minnesota.

In *State v. McAdoo,* 330 N.W.2d 104 (Minn.1983), we stated that the state has the burden at a sentencing hearing of establishing the facts necessary to justify consideration of out-of-state convictions in determining a defendant's criminal history score. In *McAdoo* the fact that the prior conviction was not in dispute but the underlying facts were. We held that the trial court was justified in relying on police reports from Illinois in determining the underlying facts.

In this case the defendant's attorney on appeal apparently does not *really* dispute the fact that defendant has a prior conviction in Illinois for escape. The attorney's main concern seems to be with establishing some requirement that whenever the defendant wants to put the state to its burden of proving a prior conviction, the state must come forward with certified copies. We refuse to make that an absolute requirement because, as the record in this case illustrates, it is apparently difficult to get certified copies from some places. Rather, we believe that Minn.R.Evid. 1005 provides an appropriate standard for use in this context. That rule provides:

> The contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed, including data compilations in any form, if otherwise admissible, may be proved by copy, certified as correct in accordance with Rule 902 or testified to be correct by a witness who has compared it with the original. *If a copy which complies with the foregoing cannot be obtained by the exercise of reasonable diligence, then other evidence of the contents may be given.* (Emphasis supplied).

In this case we believe that the state came forward with sufficient information to prove by a fair preponderance of the evidence that defendant had a prior conviction for escape in Illinois.

Affirmed.