**STATE of Minnesota, Respondent,**

**v.**

**Antoine Edward Eugene COURTNEY, Appellant.**

**Nos. A03–790, A03–791.**

Court of Appeals of Minnesota.

July 6, 2004.

Mike Hatch, Attorney General, James B. Early, Assistant Attorney General, St. Paul, MN, and Richard W. Jackson Jr., Houston County Attorney, Caledonia, MN, for respondent.

Mark D. Nyvold, St. Paul, MN, for appellant.

Considered and decided by HUDSON, Presiding Judge, RANDALL Judge, and FORSBERG, Judge.*

## OPINION

RANDALL, Judge.

This is a consolidated appeal from convictions and sentences for two second-degree assaults arising out of separate incidents. On appeal from his conviction and sentence for the assault against his former girlfriend, Courtney argues that the district court abused its discretion by (1) admitting the hearsay statements of his former girlfriend and her six-year-old daughter, (2) denying his request for a continuance where his newly retained attorney had only a day to prepare for trial, and (3) granting the state's challenge for cause of a juror who indicated skepticism of police without allowing the defense to rehabilitate the juror.

On appeal from his conviction and sentence for assaulting a police officer, Courtney argues that the district court abused its discretion in admitting as *Spreigl* evidence Courtney's prior assault against his former girlfriend. Courtney argues that he was not given timely notice of the offered *Spreigl* incident, the incidents were too dissimilar to be relevant, and its admission was far more prejudicial than probative.

In both files, Courtney argues that the district court erred in calculating his criminal-history score and by imposing a five-year mandatory minimum sentence under Minn.Stat. § 609.11.

## FACTS

### Alleged Assault of S.B.

Courtney was charged with second-degree assault,[1] two counts of domestic assault, terroristic threats, and fourth-degree criminal damage to property for alleged incidents occurring during September 19–21, 2001.

On September 21, 2001, at approximately 10:40 a.m., Caledonia Police Chief Duane St. Mary responded to a report of an alleged domestic incident at S.B.'s apartment located in Caledonia. Chief St. Mary testified that S.B.'s face was "terribly swollen" and that she had a "humongous black eye." He also testified that

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. Art. VI, § 10.

1. Courtney was charged with one count of domestic assault with intent to inflict bodily harm and one count of domestic assault with intent to cause fear.

S.B. had red marks on the left side of her neck, her upper right cheek looked swollen, and she had a broken blood vessel in her right eye.[2]

Chief St. Mary testified that in a tape-recorded interview S.B. told him that Courtney, the father of two of S.B.'s children, had assaulted her. S.B.'s tape-recorded statement was played for the jury during Chief St. Mary's testimony. Chief St. Mary testified that Courtney hit her like a man, "beat her face in," and choked her. S.B. told Chief St. Mary that the incident started on Wednesday, September 19, 2001, after she received a phone call from Courtney stating that he wanted to visit their children. She told Chief St. Mary that while Courtney was at the apartment, she received a phone call from a male and Courtney became upset and wanted to know the identity of the male caller. S.B. told Chief St. Mary that she did not know who the caller was, but that Courtney insisted she tell him or he would choke it out of her.

Chief St. Mary testified that S.B. told him that Courtney began hitting her in the living room/kitchen area, took her into the bedroom, and threw her on the bed. When S.B. tried to get away, Courtney grabbed her by the hair, and started choking and hitting her again. S.B. told Chief St. Mary that, as Courtney was hitting her, blood splattered all over. Chief St. Mary testified that he saw what appeared to be blood splatters on the bedroom walls, but did not observe any blood on the bedroom carpet or in the living room.[3] He stated that S.B. told him that she attempted to defend herself with a knife, but Courtney took it away and held it to her throat demanding that S.B. tell him the identity of the caller. S.B. told Chief St.

Mary that she was afraid Courtney would kill her. S.B. later gave Chief St. Mary the knife allegedly used during the incident, and the knife was admitted into evidence. Chief St. Mary testified that S.B. told him the children were in the bedroom upstairs during the incident.

S.B. told Chief St. Mary that the following day, Thursday, September 20, Courtney took her to the bathroom of her apartment and choked her again demanding she tell him the identity of the male caller. S.B. stated that after about a minute or so she passed out because she could not breathe. She also stated that she thought she had hit her head on the corner of bathtub, and that she woke up with her head in the toilet. S.B. told Chief St. Mary that she gave Courtney the phone number of the man who had called and that Courtney quit choking her. She also told him that the children were in the living room during this incident.

Chief St. Mary testified that S.B. told him that on the morning of Friday, September 21, Courtney broke her two telephones, and took her money and a three-carat gold diamond ankle bracelet. Chief St. Mary observed the broken telephones when he interviewed S.B. at her apartment. S.B. told Chief St. Mary that Courtney damaged the phones so she could not call anyone. S.B. also stated that she had spent time in women's shelters in Red Wing and Rochester because she was "running" from Courtney.

Chief St. Mary also testified that on October 8, 2001, he arranged for S.G., S.B.'s daughter, to be interviewed by Child Protection Worker Kristi Peterson of the Winona County Human Services Depart-

---

2. Chief St. Mary took several photos of S.B. and the apartment at this time.

3. A chemical analysis was not conducted on the alleged blood splatters located on the bedroom wall.

ment. Chief St. Mary monitored the interview from another room via closed circuit T.V. The interview was videotaped, but a transcript of the interview was not prepared until after trial. A transcript was later prepared and delivered to this court for purposes of this appeal.

During the interview, S.G. told Peterson that Courtney "broke Mama's phones" and "beat [S.B.] up." She stated that she did not see Courtney break the phones, but she saw her mother's swollen eye. S.G. also stated that while she was upstairs she heard "breaking" and her "mom crying." S.G. told Peterson that the next night Courtney and S.B. were in the downstairs bathroom. She stated that she heard Courtney hitting S.B. in the bathroom more than one time. S.G. stated that she saw S.B. crying on the steps, and Courtney telling S.B. to look for the number of the male caller. Peterson asked S.G. if Courtney had said various swear words, and S.G. told her that she heard only "f—k you." S.G. also told Peterson that she was not afraid of Courtney and did not witness Courtney hurting her mother. S.G. then said that Courtney had possessed two guns and that she saw Courtney threaten her mother with them. S.G. also stated that she used to live in another town "where shelters" were located. She told Peterson that Courtney stayed at her house for two days. S.G. indicated that Courtney helped her get ready for school the morning that he left.

Over defense counsel's objection, the videotaped interview was admitted as evidence. The videotape was played for the jury during Peterson's testimony. The district court sustained defense counsel's foundation objections regarding S.G.'s statements about Courtney breaking her mother's phones, beating up or assaulting S.B., and her statements about the firearms. The court instructed the jury to disregard those statements. The district court also admitted, over defense counsel's objection, two drawings made by S.G. during the interview. The first drawing was done by Peterson and depicts the members of S.G.'s family. The second drawing was done by S.G. and depicts two guns S.G. said Courtney had allegedly used to threaten her mother.

Dr. Alan Fleischmann, a Caledonia physician, testified that he treated S.B. on September 22, 2001. Dr. Fleischmann testified that S.B. told him that on September 19 and 20, 2001, Courtney had beaten her. S.B. told Dr. Fleischmann that Courtney had punched her in the face and chest, and "throttled her twice." She also told Dr. Fleischmann that she thought she was going to die. Dr. Fleischmann testified that S.B. had a two-centimeter bruise on the back of her head, a left black eye, and a right black eye that was fading. Fleischmann also stated that S.B. had hemorrhages under her eyelids, a tender jaw, swollen cheeks, and finger marks on the left side of her neck. Dr. Fleischmann testified that she also had pain and tenderness in her chest. After observing S.B.'s injuries, Dr. Fleischmann concluded that her injuries were consistent with what S.B. told him had happened.

At trial, S.B. recanted her pretrial statements and testified for the defense. Her testimony conflicted with what she previously told Chief St. Mary. S.B. testified that, at the time of the incident, Courtney was living in her apartment but was rarely there. S.B. also testified that she and Courtney were in a relationship at the time of the incident, and that on September 19, 2001, Courtney came to visit her. She stated that she knew Courtney was coming to visit, he had a key to the apartment, and he let himself in because she was at a class that afternoon. S.B. testified that she first saw Courtney when she

came home at about 2:30 or 3:00 p.m. that afternoon.

S.B. testified that Courtney's cell phone rang numerous times and she answered it. After hearing a female on the other end, she became angry. S.B. stated that Courtney started laughing at her and she became angrier. S.B. testified that she ripped the buttons off his shirt. S.B. also testified that Courtney kept brushing off her questions so she got a knife and started threatening him. She testified that the knife was a "little bigger" than the one in evidence. S.B. stated that she held the knife in a position so that she could stab Courtney with it. S.B. testified that she "jabbed" at Courtney with the knife. She stated that Courtney grabbed a stool about three feet long and told her that if she did not put the knife down he would hit her with the stool. She also stated that Courtney swung the stool back and forth several times at her trying to get her to drop the knife.

According to S.B., after she was hit in the head numerous times with the stool, she dropped the knife and was not hit anymore. S.B. testified that Courtney hit her with the stool on the upper part of her body. When asked how she received the marks on her neck and face, S.B. testified that she could not recall exactly where she was getting hit during the incident. S.B. stated that Courtney put the knife in the sink and the rest of the day they made up. The episode lasted a little more than an hour and the children were upstairs the entire time. S.B. testified that Courtney never choked her or pulled her hair, and did not have any further physical contact with her the next day. She also noted that Courtney left for the Twin Cities the next day, on September 20, 2001.

S.B. testified that she called the police on September 21, 2003, and told Chief St. Mary that Courtney had choked her and done other things to her only because she was angry about the woman who called Courtney and because Courtney had left her. S.B. testified that the statement she gave to Chief St. Mary was untruthful. S.B. stated that she lied when she told Chief St. Mary that Courtney pulled a knife on her, choked her, and threatened her with the knife. S.B. also stated that she broke the telephones in her apartment because she got angry when Courtney left. She testified that she had the diamond bracelet she told the police Courtney had taken. S.B. also testified that she lied to Chief St. Mary because she "was mad at [Courtney]" and "didn't care what happened."

S.B. testified that she spent time at women's shelters in Rochester and Red Wing because she and Courtney were separated at the time and she had no place to live. She stated that she was not hiding from Courtney and that he visited her at the women's shelters. S.B. testified that she lied when she told Chief St. Mary that she was going to the shelters to get away from Courtney. S.B. also testified that she did not recall what she told Dr. Fleischmann about the bruise on her face. S.B. stated that she filed an order for protection on September 21, 2003, but later asked to have it dismissed.

Deputy Linda Coffield testified that around midnight November 14–15, 2001, she took a statement from S.B. Coffield stated that S.B. said she had lied in her previous statement to Chief St. Mary in September.

Courtney took the stand and his testimony was consistent with S.B.'s. The jury found Courtney guilty of second-degree assault, two counts of domestic assault, terroristic threats, and fourth-degree criminal damage.

## Assault of Officer Stemper

Courtney was charged with second-degree assault, possession of a firearm with a removed serial number, possession of a pistol after having been convicted of a felony, and fifth-degree possession of marijuana for incidents that occurred on November 14, 2001. The state later dismissed the possession of a pistol and controlled substance charges.

Officer James Stemper testified that on November 14, 2001, he received a phone call from S.B.'s mother. She told him she was concerned for S.B.'s safety because there had been a physical altercation between S.B. and Courtney. S.B.'s mother said there was a protective order or harassment order against Courtney in Houston County. Officer Stemper researched the protective order and then, at approximately 11:30 p.m., went to S.B.'s apartment to make a welfare check and possible order-for-protection violation. Officer Heath Dienger and Deputy Linda Coffield accompanied Stemper to S.B.'s apartment.

Stemper and Dienger knocked on the apartment door and were met by Sherry Pitts. Stemper recognized Pitts as someone that he knew occupied another apartment in the building. Stemper said he would like to speak with Pitts and Pitts let both Stemper and Dienger into the apartment. Upon entering, Stemper saw S.B. sitting in a chair. Stemper asked S.B. if he could speak with her and S.B. nodded in apparent agreement.

Stemper then asked S.B. if he could speak with Courtney, and S.B. said, "Sure, he's in another apartment." Pitts said Courtney was in her apartment and left through the rear door of the apartment leading into the common hallway to get him. Courtney opened the rear door of S.B.'s apartment and Stemper asked him to step inside to talk. Courtney told

Stemper, "Yeah, just a second," shut the door, and took off running down the hallway. Stemper pursued Courtney out the same door and could see Courtney about half way down the hallway. Stemper saw Courtney reach with his right hand underneath the lightweight jacket he was wearing, pull from the small of his back a stainless steel-colored semiautomatic handgun, and hold it by the handle. Stemper yelled "gun" to his back up officers, told Courtney to get down repeatedly, and continued to pursue Courtney by running down the hallway toward the garage door while drawing his own weapon. Stemper testified that he saw Courtney run to the end of hall, slip and end up on one knee, and then start to open the door to the attached garage with his left hand.

Stemper testified that he saw Courtney opening the door with his left hand while he was on one knee, and then swing his right arm and the gun up towards Stemper. Stemper stated that the gun was pointed directly at him. Stemper testified that any bullet would have fired directly at him and would have hit four or five feet ahead of him. Once Courtney got into the garage, Courtney hit the ground as Stemper ordered and the gun slid out of Courtney's hand. Stemper kicked the gun under a car in the garage and handcuffed Courtney. Stemper estimated the incident lasted about two and a half seconds.

Officers Dienger and Coffield did not see Courtney point the gun at Officer Stemper. Dienger testified that he heard Stemper yell "gun," but by the time he got halfway down the hallway Courtney was going through the garage door. Coffield testified that she was stationed in the garage area behind a parked car. She testified that she saw Courtney coming through the garage door and heard Stemper yelling, "gun." Officers also found that the pistol had one bullet in the cham-

ber and ten in its magazine. Officers found $1,473.24 in the right front pocket of Courtney's pants and a small amount of marijuana in Courtney's left front pants pocket.

Courtney did not testify in this trial. The state introduced as *Spreigl* Courtney's previous assault against S.B. Courtney was found guilty of second-degree assault and possession of a firearm without a serial number.

## Sentencing

On May 23, 2003, Courtney appeared for sentencing in both files. The state introduced Courtney's three prior Missouri offenses as felony convictions for purposes of calculating his criminal history score. The probation officer calculated that Courtney had three-point-five criminal history points, which was rounded down to three. Accordingly, Courtney was sentenced to 39 months in prison for the assault against S.B. Courtney received an additional one-point-five points for his conviction for the assault against S.B. However, Courtney was not sentenced based on his criminal history score. Courtney was sentenced to a mandatory minimum of 60 months in prison for the assault against Officer Stemper. The court determined that Courtney's prior Missouri conviction for unlawful possession of a firearm constituted a qualifying offense under Minn.Stat. 609.11, making his conviction for assault against Officer Stemper a second offense. This sentence was to be served consecutively with the 39–month sentence.

## ISSUES

1. Did the district court abuse its discretion by admitting the hearsay statements of S.B. and her daughter S.G.?

2. Did the district court abuse its discretion by admitting evidence of Courtney's assault against S.B. as

*Spreigl* evidence in the trial for assault against a police officer?

3. Did the district court abuse its discretion by denying Courtney's newly retained attorney a continuance where he had only one day to prepare for trial?

4. Did the sentencing court err by including Courtney's prior Missouri offenses in calculating his criminal history score, and by imposing the mandatory minimum sentence under Minn.Stat. § 609.11?

5. Did the district court abuse its direction when it granted the prosecution's challenge for cause against a prospective juror, without allowing the defense an opportunity to rehabilitate the juror?

## ANALYSIS

We first address the evidentiary issues raised in this appeal. "Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the trial court abused its discretion and that appellant was thereby prejudiced." *State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003) (citations omitted).

### I.

## Hearsay Statements

Courtney contends that the district court's admission of S.B.'s tape-recorded statement and S.G.'s videotaped statement violated his constitutional right to confrontation. He asserts that the admission of this evidence is prejudicial and that, as a result, his conviction for assault against S.B. must be reversed.

## Crawford v. Washington

While this appeal was pending, the United States Supreme Court clarified the scope of a criminal defendant's right under the Sixth Amendment to confront and cross-examine witnesses against him or her and re-emphasized the significance of this right. *Crawford v. Washington,* —— U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford,* the Supreme Court overruled its decision in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), as it applied to "testimonial" hearsay statements. Under *Roberts,* for purposes of the confrontation clause, all out-of-court hearsay statements were admissible if they fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." 448 U.S. at 66, 100 S.Ct. at 2539. The *Roberts* test allowed a jury to hear hearsay evidence if (1) the declarant was unavailable to testify, and (2) the statement bore "indicia of reliability." *Id.*

In *Crawford,* the Supreme Court reversed Crawford's conviction on the ground that the introduction of Crawford's wife's hearsay statement to police officers violated his right to confrontation. 124 S.Ct. at 1374. Crawford's wife did not testify at trial asserting her marital privilege but the state offered her tape-recorded statement to police as evidence that Crawford had not acted in self-defense. *Id.* at 1357–58. The district court had admitted the statement on the ground that the statement contained "particularized guarantees of trustworthiness." *Id.* at 1358. The jury found Crawford guilty of assault. *Id.* Using a nine-factor test, the Washington Court of Appeals reversed, concluding that the statement was not trustworthy. *Id.* The Supreme Court of Washington reinstated the conviction, holding that the statement contained particularized guarantees of trustworthiness.

*Id.* The United States Supreme Court reversed, holding that testimonial statements may be admitted as evidence against a criminal defendant *only* if (1) the declarant is unavailable to testify, and (2) defendant has a prior opportunity to cross-examine the declarant. *Id.* at 1370–74.

The *Crawford* Court reasoned that the various reliability factors applied by individual states are too subjective and do not conform to a defendant's right to confront his or her accusers. *Id.* at 1371. The Court stated:

> The framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations. Reliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable[.] .... Whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them. Some courts wind up attaching the same significance to opposite facts.

*Id.* The Court also reasoned that cross-examination is as important as the right to trial by jury. *Id.* at 1371. The Court stated that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Id.*

Although the *Crawford* Court did not define the term "testimonial statements." it did list three categories of testimonial statements. *Crawford,* 124 S.Ct. at 1374. The Court stated:

> We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial;

and to police interrogations. These are modern practices with closet kinship to the abuses at which the Confrontation Clause was directed.

*Id.*

### A. S.B.'s Tape-recorded Statement

■ At Courtney's pretrial hearing, the state offered the admission of S.B.'s September 21, 2001 statement to a police officer. Courtney objected but the district court admitted the statement under Minn. R. Evid. 803(24), finding that (1) S.B. was unavailable to testify, and (2) that her statement had sufficient guarantees of trustworthiness to justify its admission.

■ We conclude S.B.'s pretrial statement was properly admitted. We note that S.B.'s statement was testimonial. *See Crawford,* 124 S.Ct. at 1364 (stating that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that person who make a casual remark to an acquaintance does not."). Courtney had an opportunity to cross-examine S.B. at trial. S.B. appeared and testified for the defense on the last day of trial and was subject to direct and cross-examination by both sides. The statement comes in because S.B. was available for questioning on her prior statement. *See California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (stating that "the Confrontation Clause is not violated by admitting a declarants out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination."). S.B. had the right, at trial, to explain her pretrial statement to police where she incriminated Courtney. Obviously, both sides could and did use her prior pretrial statement to test her credibility at trial and to urge their own respective positions. The test is not the *"Roberts* test," meaning whether the out-of-court statement was "reliable," but rather the test for admissibility is whether it could be used to impeach the witness's credibility without violating the Sixth Amendment. Because S.B. testified at Courtney's trial and was available for cross-examination, the district court properly admitted S.B.'s pretrial statement.

### B. S.G.'s Statement

■ At Courtney's pretrial hearing, the state offered the videotaped interview between S.G. and a child-protection worker. The district court admitted the statement under Minn. R. Evid. 803(24), finding that (1) S.G. was unavailable because her mother was unavailable, and (2) the questions asked by the child-protection worker did not appear overly suggestive.

S.G.'s statement is testimonial. A child-protection worker, along with a law enforcement officer, interviewed S.G. for the purpose of developing the case against Courtney. The same police officer that questioned S.B., observed S.G.'s interview via T.V. satellite. At one point, the interview was stopped by the police officer when he directed the child-protection worker to ask S.G. to draw the guns she saw Courtney allegedly use to threaten S.B. The circumstances under which the interview was conducted show it was made in preparation for the case against Courtney. Most importantly, S.G. did not testify at trial *and* Courtney did not have a prior opportunity to cross-examine her. The out-of-court statement should not have come in because it was testimonial, S.G. was unavailable for trial, and Courtney did not have an opportunity to cross-examine her. *See Crawford,* 124 S.Ct. at 1374 (reversing defendant's conviction on the grounds that admission of wife's testimonial hearsay statement to police violated his right to confrontation because defendant

had no prior opportunity to cross-examination her).

■ At oral argument, the state argued that the admission of S.G.'s statement was harmless error. We disagree. We recognize that "[c]onstitutional error is not reversible error, however, if it is found harmless beyond a reasonable doubt." *State v. Larson,* 389 N.W.2d 872, 875 (Minn.1986) (citations omitted). In this case, the credibility of S.B.s testimony was the critical issue at trial. The state used S.B.s pretrial statement, where she accused Courtney of assaulting her, as evidence tying Courtney to the crime. The state argued the issue of S.B.s credibility to the jury in its closing argument. The state sorely needed corroboration for S.B.'s pretrial statement because, at trial, she said the opposite. S.G.'s statement served that function, making it more likely that the jury would conclude that S.B.'s trial testimony was false and that the pretrial statement implicating Courtney in a crime was the truth. We cannot say that the error was harmless beyond a reasonable doubt. Further, the *Crawford* Court declined to address whether appellate courts apply a harmless error analysis to such violations. We note that, given the circumstances in this case and the Supreme Court's emphasis on a criminal defendant's right to confrontation, the error was not harmless, if even a harmless error analysis can be reached by the state.

In light of *Crawford,* Courtney is entitled to a new trial for the alleged assault against S.B. where the state will be prohibited from introducing the statements of S.G. unless she is available for cross-examination.

## II.

### *Spreigl* Evidence

■ In the trial for the assault against Officer Stemper, Courtney argues that the district court abused its discretion by admitting as *Spreigl* evidence Courtney's assault against S.B. Courtney argues that he was not given timely notice of the state's intent to introduce the prior alleged assault against S.B., the incidents were too dissimilar for the assault against S.B. to be relevant, and the offered *Spreigl* evidence was more prejudicial than probative. Courtney alternatively claims that he was prejudice by the untimely notice and that even if *Spreigl* notice was not required in this case, evidence of the prior incident was not relevant to his alleged assault against Officer Stemper. The state argues that notice was not required because Courtney's prior conviction fell under the "previously prosecuted" offenses exception to the notice requirement, and that the evidence of the prior crime was relevant to prove intent in the assault against Officer Stemper.

Minn. R. Evid. 404(b) allows the admission of another crime, wrong, or act to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." The admission of this evidence, known as *Spreigl* evidence, lies within the discretion of the district court, and its ruling will not be reversed absent a clear abuse of discretion. *State v. Spaeth,* 552 N.W.2d 187, 193 (Minn.1996). *Spreigl* evidence may be admitted in a criminal prosecution only if (1) the state gives notice that it intends to use the evidence, (2) the state indicates clearly what the evidence is being offered to prove, (3) the evidence is clear and convincing that the defendant participated in the other offense, (4) the evidence is material and relevant to the state's case, and (5) the probative value of the evidence is not outweighed by its potential for unfair prejudice. *State v. Lynch,* 590 N.W.2d 75, 80 (Minn.1999). An exception to the notice

requirement exists for previously-prosecuted offenses. *State v. Spreigl*, 272 Minn. 488, 497, 139 N.W.2d 167, 173 (1965); Minn. R.Crim. P. 7.02.

In determining the relevance of *Spreigl* evidence, the district court examines the closeness of the relationship between the other crimes and the charged crime in terms of time, place, and modus operandi. *State v. Bolte*, 530 N.W.2d 191, 198 (Minn. 1995). In addition, "the direct or circumstantial evidence on the issue in question must be weak or inadequate." *State v. Stagg*, 342 N.W.2d 124, 127 (Minn.1984). When balancing the probative value of *Spreigl* evidence against its potential for unfair prejudice, the district court must consider how necessary the evidence is to the state's case. *Lynch*, 590 N.W.2d at 81; *see also State v. Slowinski*, 450 N.W.2d 107, 113–14 (Minn.1990) (noting that the district court must consider whether the evidence is necessary to support the state's burden of proof).

The state offered the alleged assault against S.B. as a prior bad act under 404(b), and not a conviction for purposes of impeachment. *See* Minn. R. Evid. 609 (governing the use of prior convictions to impeach the credibility of a witness, including that of a criminal defendant testifying on his own behalf). While the state did not disclose that it would use the assault against S.B. as *Spreigl* evidence until two days into trial, notice was not required because Courtney was previously prosecuted for this alleged offense. We conclude, however, that the district court abused its discretion by admitting evidence of the prior conviction. The crimes are dissimilar, and even though that is a subjective call, the potential for prejudice far outweighed any probative value.

The states case against Courtney for assault against Officer Stemper was not weak on intent. *See State v. Berry*, 484 N.W.2d 14, 17–18 (Minn.1992) (admission of *Spreigl* evidence proper where states evidence weak as to defendants intent and modus operandi); *see also Stagg*, 342 N.W.2d at 127 (for other-crime evidence to be admissible, direct or circumstantial evidence on issue in question must be weak or inadequate). Officer Stemper testified that Courtney aimed the gun directly at him, and three police officers testified against Courtney and implicated him in the assault. The evidence of Courtney's assault against S.B. could only act in the jurys mind to convince them that he was a bad person and that since he had done an assault before, he likely had done another. Those are exactly the reasons why bad acts evidence is forbidden unless a defendant first puts his character into issue. *See Bolte*, 530 N.W.2d at 196 (stating that "other-crime evidence is not admissible for the purpose of establishing that the defendant is of bad character because he or she committed the prior crime and therefore has a general propensity to commit other crimes"). We have concluded that a reversal in the trial involving the assault against S.B. is called for on constitutional grounds. Thus, we can only conclude that its introduction as *Spreigl* evidence in this case involving the assault on Officer Stemper was impermissibly tainted. We acknowledge that *Spreigl* evidence involving prior bad acts is not dependent on a conviction, as impeachment by conviction of a prior crime is. But that does not take away from our analysis that our reversal of the assault count against Courtney impermissibly taints bad assaults use as bona fide *Spreigl* evidence.

We find that Courtney is also entitled to a new trial on the charge of assault against Officer Stemper.

### III.

### Continuance

■ We next address Courtney's motion for a continuance in the trial for the al-

leged assault against S.B. Courtney argues that the district court abused its discretion in denying his newly retained attorney a continuance, where his attorney had only a day to prepare for trial. The state argues that Courtney intentionally delayed the proceedings.

 Generally, a ruling on a request for a continuance is within the district court's discretion and a conviction will not be reversed unless the denial is a clear abuse of discretion. *State v. Rainer*, 411 N.W.2d 490, 495 (Minn.1987). "The reviewing court must examine the circumstances before the trial court at the time the motion [for continuance] was made to determine whether the trial court's decision prejudiced defendant by materially affecting the outcome of the trial." *State v. Turnipseed*, 297 N.W.2d 308, 311 (Minn. 1980). "A defendant may not demand a continuance to delay the proceedings or by arbitrarily attempting to substitute another attorney at the time of trial." *State v. Worthy*, 583 N.W.2d 270, 278 (Minn.1998).

In both files, Courtney had three separate attorneys represent him. On December 18, 2002, Public Defender James Schultz made an initial appearance on Courtney's behalf for both files. Attorney Michael York subsequently replaced James Schultz on both files. On August 2, 2002, the district court granted York's request to continue both trials due to scheduling conflicts. On December 19, 2002, the district court granted the prosecution's request to continue the trial for the assault against S.B. because S.B. failed to appear for trial. On January 17, 2003, the district court allowed York to withdraw on both files and continued both trials until March 10, 2003, with the trial for the assault against S.B. scheduled first.

Finally, Courtney hired attorney Robert Shane to represent him in the trial for assault against Officer Stemper, and attorney Gregory Schultz to represent him in the trial for assault against S.B.

Courtney contacted attorney Gregory Schultz on Friday, March 7, 2003, to represent him in his trial on March 12. On March 11, Schultz appeared with Courtney for a pretrial conference in the matter, and requested a continuance. Schultz told the district court that when Courtney contacted him on March 7, he understood the next court appearance would be a motion hearing, and that he did not learn until March 10 that the case was set for trial. Schultz asked for a one-week continuance because he said he could not be prepared for trial the next day. The district court denied Shultz's request for a continuance stating that Courtney had delayed his trial as a result of his two prior changes of attorneys. The court then noted Schultz's expertise and experience as an attorney.

On the day of trial, Gregory Schultz renewed his request for a continuance and told the district court that he had spent the night before discussing a plea agreement that had fallen through that morning, had "scrambled" to get ready, and simply needed more time to prepare. The district court denied the motion, stating that witnesses would not be called until the following day so Schultz had that night to prepare.

We reject the district court's explanation for denying Courtney a continuance. We find little evidence to support the district court's conclusion that Courtney intentionally "delayed" his trial. Although Courtney had two previous attorneys before Gregory Schultz in the matter involving the assault against S.B., Courtney's first attorney made only an initial appearance with Courtney and Courtney's second attorney later withdrew, after working on the case for over a year. Schultz effectively had only one night to prepare for trial. This

was not helped by a misunderstanding between he and Courtney as to when the trial would begin. Although the district court granted three prior continuances in this trial, two of the continuances were due to York's scheduling conflicts and his later withdrawal from the case. The other continuance was requested by the state. The district court could have easily granted Courtney a short continuance. We find nothing in the record to indicate that a two or three-day continuance, or even a week, would have been a serious problem. The district court simply decided that Courtney had delayed the proceedings and that Gregory Schultz was competent enough to defend him without adequate time to prepare. Although the district court's denial of the continuance arguably prejudiced the outcome of the trial, we note that our decision to reverse the conviction does not turn on this issue. Perhaps by itself it might not be enough for a new trial, but in view of other errors, it strengthens the need for a new trial. See *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994) (reversing based on cumulative effect of trial errors). It was an abuse of discretion for the district court not to give Courtney's attorney at least a short continuance.

## IV.

**Sentencing**

In both files, Courtney argues that the district court erred in calculating his criminal history score, and by imposing a five-year mandatory minimum sentence under Minn.Stat. § 609.11 (2002). Although we are sending this matter back for a new trial, since this is an issue capable of repetition, we will not avoid review, but rather will address it on the merits in this appeal.

On May 23, 2003, Courtney was sentenced on both files. At the sentencing hearing, the district court found that Courtney's three prior Missouri offenses constituted felony convictions for purposes of computing Courtney's criminal history score. Courtney received three points for the Missouri convictions, when he was sentenced for the conviction involving the alleged assault against S.B. Courtney was then given another one-point-five points for the prior assault against S.B., giving Courtney a total criminal history score of five points. However, Courtney was not sentenced according to his criminal history score for his conviction involving the assault against Officer Stemper. Instead, Courtney received a consecutive sentence of 60 months as a mandatory minimum sentence under Minn.Stat. § 609.11.

Minnesota's Sentencing Guidelines "provide uniform standards for the inclusion and weighting of criminal history information that are intended to increase the fairness and equity" in determining a defendant's criminal history score. *State v. Reece*, 625 N.W.2d 822, 824 (Minn.2001) (quotation omitted). The guidelines require that a defendant's out-of-state felony convictions be included in the defendant's Minnesota criminal history score. *Id.* "The state has the burden of establishing the facts necessary to justify consideration of out-of-state convictions used to determine a defendant's criminal history score." *State v. Jackson*, 358 N.W.2d 681, 683 (Minn.App.1984) (citation omitted). The state must prove by a "fair preponderance of the evidence that the prior conviction was valid, the defendant was the person involved, and the crimes constituted felonies in Minnesota." *Id.* The Minnesota Sentencing Guidelines provide that "the sentencing court, in its discretion, should make the final determination as to the weight accorded foreign convictions." Minn. Sent. Guidelines cmt. II.B.504. This court reviews the district court's determination for abuse of discretion. *Reece*, 625 N.W.2d at 824.

The commentary to the guidelines provides that while calculating the criminal history score, "sentencing courts should consider the nature and definition of the foreign offense, as well as the sentence received by the offender." Minn. Sent. Guidelines cmt. II.B.504; *see also Reece*, 625 N.W.2d at 825; *Hill v. State*, 483 N.W.2d 57, 61 (Minn.1992). For offenses with monetary thresholds, "the monetary threshold in effect at the time of the offense was committed determines that offense classification for criminal history purposes, not the current threshold." Minn. Sent. Guidelines cmt. II.B.502.

## A. Suspended Imposition of Sentence

■ At sentencing, the state produced a record of Courtney's three prior Missouri offenses.[4] The record indicates that on February 26, 1987, Courtney pleaded guilty to second-degree burglary (occurred on August 1, 1986) and receiving a stolen rifle and shotgun (occurred on August 26, 1986). In 1994, Courtney also pleaded guilty to unlawful possession of a concealable firearm. Courtney received suspended imposition of sentences for each offense. Courtney argues that the suspended imposition of sentences do not constitute convictions for purpose of calculating his criminal history score. The state argues that the suspended imposition of sentences constitute convictions.

First, the record indicates that Courtney pleaded guilty to all three offenses. *See* Minn.Stat. § 171.01, subd. 13 (2002), (stating that "conviction" is defined as a final conviction or upon a plea of guilty). Second, the suspended imposition of sentences Courtney received in all three instances

constitute felony convictions for purposes of calculating Courtney's criminal history score. Courtney argues that because Missouri law does not treat a suspended imposition of sentence as a conviction, this state should not treat them as convictions. The state cites *State v. Strom*, 430 N.W.2d 860, 863–64 (Minn.App.1988), where this court held that the defendant's North Dakota offense in which defendant had received a deferred or stayed sentence and was placed on probation, should have been considered in his criminal history score for sentencing on a subsequent conviction.

Like the disposition in *Strom*, which constituted a deferred or stayed sentence after the defendant pleaded guilty to the charged offense, Courtney received suspended sentences in all three cases after pleading guilty to all three offenses. Minnesota Sentencing Guidelines cmt. II.B.101 provides that an "offender is assigned a particular weight for every felony conviction for which a felony sentence was stayed or imposed before the current sentencing or for which a stay of imposition of sentence was given for a felony level offense." The Minnesota district court reasonably concluded that a Missouri suspended imposition of sentence was the equivalent of our stay of imposition of sentence. Courtney pleaded guilty and received suspended imposition of sentences in all three prior Missouri offenses. Thus, the prior out-of-state offenses constitute felony convictions for purposes of calculating Courtney's criminal history score. The district court correctly calculated Courtney's criminal history score in sen-

---

4. The state offered copies of all three offenses. Although the copies were not certified, the district court contacted paralegal Sam Einfeldt of the Jackson County Prosecutor's Office and Kansas City Drug Unit who provided foundation for the admission of Courtney's three convictions. *See State v. Griffin*, 336 N.W.2d 519, 525 (Minn.1983) (stating that a certified record is not an absolute requirement in determining a defendant's criminal history score based on out-of-state convictions).

tencing him for his conviction involving S.B.

## B. Receiving Stolen Property

█ In 1987, Courtney pleaded guilty to receiving stolen property valued over $150, including a rifle, shotgun, and other miscellaneous property. Courtney contends that because under Minnesota law receiving stolen property valued at $250 or less constitutes a misdemeanor, the Missouri conviction is not a felony. Courtney argues that the record is inadequate because the state failed to submit any evidence regarding the value of the stolen property. The state argues that because Courtney was convicted of receiving a stolen rifle and shotgun, the crime constituted a felony for purposes of calculating Courtney's criminal history score.

Courtney pleaded guilty to committing a class C felony of receiving stolen property in violation of Missouri statute 570.080 (1986), punishable under Missouri Approved Charges—Criminal (MACH–CR) 24.10. *See State v. Hicks*, 805 S.W.2d 711, 712–13 (Mo.App.1991). MACH–CR 24.10 provides that a defendant is to be charged as follows: "the defendant . . . with the purpose to deprive the owner of [describe the property] (received) (kept) (disposed of) such property, (of a value of at least one hundred fifty dollars,) (knowing) (believing) (knowing or believing) that it had been stolen." *Id.*

Minn.Stat. § 609.53, subd. 1 (1986), provides that "[A]ny person who receives, possesses, transfers, buys or conceals any stolen property or property obtained by robbery, knowing or having reason to know the property was stolen or obtained by robbery."

Minn.Stat. 609.53, subd. 1(4), states that "if the property is a firearm, to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both." Minn.Stat. § 609.52, subd. 3(3)(e) (1986), provides punishment "for not more than 20 years or to payment of a fine of not more than $100,000, or both, if the property is a firearm."

Assuming that the monetary exception applies, the applicable Minnesota statute in effect in 1987 provided a punishment of more than one year for receiving a stolen firearm. Thus, under Minnesota law the Missouri crime would constitute a felony. *See* Minn.Stat. § 609.02, subd. 2 (2002), (stating that in Minnesota, a "felony" is defined as "a crime for which a sentence of imprisonment for more than one year may be imposed."). Even if the monetary exception does not apply, the current Minnesota statute and the 1986 statute both provide a separate felony punishment for receiving stolen guns. *See* Minn.Stat. § 609.53, subd. 1 (2002); Minn.Stat. § 609.52, subd. 3(1) (2002). It does not matter that the record does not specify the value of the stolen property because the stolen property in question consisted of stolen firearms. By applying either the relevant 1986 or 2002 statute, Courtney's Missouri offense for receiving stolen property constitutes a felony conviction for purposes of computing Courtney's criminal history score.

## C. Firearms Conviction

█ The district court imposed a mandatory minimum sentence of 60 months for Courtney's second-degree assault conviction involving Officer Stemper, which involved a firearm. The court found that Courtney's 1994 Missouri unlawful possession of concealable firearm was a qualifying offense making the conviction involving Officer Stemper a second or subsequent conviction under Minn.Stat. 609.11, subds. 5(a), 9 (2002).

Courtney argues the unlawful possession of a firearm is not a conviction under Minn.Stat. 609.11, subd. 5(a), because he received a suspended imposition of sentence on that offense. He also argues that the offense is not a conviction under the statute because Minn.Stat. 609.11, subd. 9, does not specify that out-of-state offenses qualify under the statute. The state argues that the suspended imposition of sentence constitutes a conviction, and Minn. Stat. 609.11, subd. 5(a), does not require that the prior offense be a Minnesota offense.

Although the district court did not err in calculating Courtney's criminal history score, we conclude the court erred in imposing a mandatory five-year minimum sentence. Courtney did not raise this issue to the district court, but we exercise our discretion to address this issue. Minn. R.Crim. P. 28.05, subd. 2 (stating that this "court may dismiss or affirm the appeal, vacate or set aside the sentence imposed ... and direct entry of an appropriate sentence or order further proceedings to be had as the court may direct.").

We agree with the state that an out-of-state conviction can be a qualifying offense under Minn.Stat. 609.11, subd. 5, but it still must be one of the offenses listed in Minn. Stat. 609.11, subd. 9. Minn.Stat. 609.11, subd. 4, establishes mandatory minimum sentences for certain offenses, which are committed with the use of firearms. Minn. Stat. 609.11, subd. 5(a), provides that:

> [A]ny defendant convicted of an offense listed in *subdivision 9* in which the defendant or an accomplice, at the time of the offense, had in possession or used, whether by brandishing, displaying, threatening with, or otherwise employing, a firearm, shall be committed to the commissioner of corrections for not less than three years, nor more than the maximum sentence provided by law.

> *Any defendant convicted of a second or subsequent offense in which the defendant or an accomplice, at the time of the offense, had in possession or used a firearm shall be committed to the commissioner of corrections for not less than five years, nor more than the maximum sentence provided by law.*

(Emphasis added). Minn.Stat. 609.11, subd. 9, provides that:

> The crimes for which mandatory minimum sentences shall be served as provided in this section are: murder in the first, second, or third degree; assault in the first, second, or third degree; burglary; kidnapping; false imprisonment; manslaughter in the first or second degree; aggravated robbery; simple robbery; first-degree or aggravated first-degree witness tampering; criminal sexual conduct under the circumstances described in sections 609.342, subdivision 1, clauses (a) to (f); 609.343, subdivision 1, clauses (a) to (f); and 609.344, subdivision 1, clauses (a) to (e) and (h) to (j); escape from custody; arson in the first, second, or third degree; drive-by shooting under section 609.66, subdivision 1e; harassment and stalking under section 609.749, subdivision 3, clause (3); possession or other unlawful use of a firearm in violation of section 609.165, subdivision 1b, or 624.713, subdivision 1, clause (b), a felony violation of chapter 152; or any attempt to commit any of these offenses.

Accordingly, Courtney could be sentenced to a mandatory minimum five-year sentence if any of his prior offenses *included* the use of a firearm and his current offense constitutes a "second or subsequent offense." The statute provides that Courtney must have first been convicted of one of the offenses listed in Minn.Stat. 609.11, *subd. 9,* while in possession of a firearm. Courtney's conviction for unlawful posses-

sion of a concealable firearm *is not listed under Minn.Stat. 609.11, subd. 9.* That conviction cannot, therefore, constitute the first qualifying offense to make the conviction for assault against Officer Stemper a "second or subsequent offense" under Minn.Stat. Minn.Stat. 609.11, subd. 5. The district court erred in sentencing Courtney to a mandatory 60–month sentence for his conviction involving Officer Stemper because Courtney's prior unlawful possession of a firearm conviction was not a qualifying offense.

**V.**

**Challenge for Cause**

 In the trial for the assault against S.B., Courtney argues that the district court erred by granting the state's motion to strike a juror for cause, arguing that the ruling gave the state an "extra" peremptory strike. We disagree. The district court is in the best position to determine whether a juror can be impartial because the court heard the juror's testimony during voir dire and observed his demeanor. *State v. Drieman,* 457 N.W.2d 703, 708–09 (Minn.1990). The district court must decide whether the juror can be rehabilitated or "can set aside his or her impression or opinion and render an impartial verdict." *Id.* at 708; *State v. Logan,* 535 N.W.2d 320, 323 (Minn.1995) (citations omitted). The district court's resolution of the question of a prospective juror's impartiality is entitled to special deference because it involves a credibility determination. *Logan,* 535 N.W.2d at 323.

The Minnesota Rules of Criminal Procedure provide the following as a basis for striking a juror for cause:

> The existence of a state of mind on the part of a juror, in reference to the case or to either party, which satisfies the court that the juror cannot try the case impartially and without prejudice to the

substantial rights of the party challenging.

Minn. R.Crim. P. 26.02, subd. 5(1).

During voir dire, defense counsel asked one of the potential jurors if there was "anything about [his]/that relationship [with Chief St. Mary] that would possibly make it hard for you to be fair in this case?" The juror replied, "No, no." The prosecutor subsequently questioned the same juror. The prosecutor and the juror had the following exchange:

[Q]: I say Caledonia Police Department and what's your first thought?

[A]: Do I have to answer that?

[Q]: Well, I will?

[A]: I could write you a whole book on that. Real stuff from other cops, for instance.

[Q]: Excuse me just a second. Let me ask you kind of a follow-up question instead. Would you have a generally positive feeling towards the Caledonia Police Department, generally negative or would you characterize it some other way?

[A]: I have got to tell the truth?

[Q]: Yep.

[A]: It is definitely not positive.

[Q]: So if an officer from that department comes up here, where is he going to start at with you in terms of his credibility or believability?

. . .

[Q]: Where would they start?

[A]: Well, which one are you talking about?

[Q]: Well, I believe in this specific case we indicated [that you are] likely to hear testimony from Chief St. Mary.

[A]: Okay. Right there he would have to go a long ways.

[Q]: He would have to go farther than somebody else?

[A]: Yeah.

The prosecutor then challenged the juror for cause. Defense counsel objected to the challenge, and requested an opportunity to rehabilitate the juror. The district court denied defense counsel's objection and granted the state's motion to strike the juror. The court stated that the juror,

> indicated very strongly that he would not give any type of face acceptance based upon the facts or whatever to a particular witness who is going to be called. So I think he has in fact prejudiced himself beyond the point of being rehabilitated and I mean the record will show pretty clearly this is a person who is going to speak his mind. I am concerned that he will poison the rest of the panel if he gets any more questions on it.

Courtney argues that precluding an opportunity to rehabilitate a juror provides an unfair disadvantage to the party opposing the challenge because it gives the challenging party an "extra" peremptory challenge. (The state would have had to use one of its unused peremptory challenges to strike the juror if Courtney's attorney had been able to successfully rehabilitate the juror and if the court denied the challenge for cause). The state argues that because the prosecutor did not use any of its peremptory challenges during voir dire, there would not have been any prejudice even if the district court had denied its challenge for cause. The state could have used one of its peremptory challenges (the state had three), and it still would have been left with two unused peremptory challenges.

We agree with the state. First, Courtney does not have a constitutional argument nor any argument deeply imbedded in any statute or caselaw. Allowing either defense or prosecutor a chance to "rehabilitate" a juror, after a challenge for cause has been made, is usual and fairly custom-

ary, but it is a discretionary call on the part of the district court. The trial judge has the absolute right to determine from a juror's answers that a challenge for cause is justified and no further questioning by the other side in an attempt to "save" the juror is needed. Here, the district court made a determination that the juror could not be rehabilitated. The transcript indicated that the juror was biased against Chief St. Mary and officers in the Caledonia Police Department. The juror admitted that he could not assign the same credibility and believability to an officer from the Caledonia Police Department. The district court was in the best position to determine whether this juror could be impartial and if the juror could be rehabilitated. The evidence indicates the juror's potential bias against the Caledonia Police Department and supports the district court's conclusion. The district court did not abuse its discretion by granting the state's motion to strike the juror for cause. The court did not err when it did not allow the defense additional time to further question the juror.

### DECISION

Courtney is entitled to a new trial for the alleged assault against S.B. The district court's admission of S.B.'s statement to the child-protection worker and police violated Courtney's right to confrontation. Courtney had no prior opportunity to cross-examine the child witness. The district court's admission of S.G.'s statement to police, however, did not violate Courtney's right to confrontation.

The district court abused its discretion in denying Courtney's motion for a continuance where Courtney's newly retained attorney effectively had only one night to prepare for trial.

In the trial for assault against Officer Stemper, Courtney is entitled to a new

trial. The district court abused its discretion by admitting evidence of Courtney's alleged assault against S.B. The states case was not weak on intent, the evidence of the assault against S.B. was far more prejudicial than probative, and a reversal of the conviction for assault against S.B. on constitutional grounds taints the admission of that evidence being used as bona fide *Spreigl* evidence.

Courtney's prior Missouri offenses where Courtney pleaded guilty and received suspended imposition of sentences in all three cases constituted felony convictions for purposes of calculating Courtney's criminal history score. However, for the conviction involving Officer Stemper, the district court erred in imposing a mandatory five-year minimum sentence under Minn.Stat. 609.11. Courtney's prior Missouri conviction for unlawful possession of a firearm was not a qualifying offense under the statute. Thus, his conviction involving Officer Stemper was not a second offense under the five-year mandatory minimum sentence.

**Reversed and remanded.**