STATE of Minnesota, Appellant,

v.

Antoine Edward Eugene COURTNEY,
Respondent

State of Minnesota, Appellant,

v.

Antoine Edward Eugene Courtney,
Respondent.

Nos. A03–790, A03–791.

Supreme Court of Minnesota.

May 12, 2005.

Mike Hatch, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN, Richard Jackson, Jr., Houston County Attorney, Caledonia, MN, for Appellant.

Mark D. Nyvold, St. Paul, MN, for Respondent.

Beverly Balos, A. Sage Van Voorhis, Carolyn Ham, Minneapolis, MN, for Amici.

## OPINION

PAGE, Justice.

Respondent Antoine Edward Eugene Courtney was charged with second-degree assault in violation of Minn.Stat. § 609.222, subd. 1 (2004), terroristic threats in violation of Minn.Stat. § 609.713, subd. 1 (2004), two counts of domestic assault in violation of Minn.Stat. § 609.2242, subd. 1(1) and (2) (2004), and fourth-degree criminal damage to property in violation of Minn.Stat. § 609.595, subd. 3 (2004), for assaulting his girlfriend S.B. in September

2001. As the result of a separate incident that took place in November 2001 in which he allegedly pointed a handgun at a police officer, Courtney was charged with second-degree assault in violation of Minn.Stat. § 609.222, subd. 1, possession of a firearm with an altered serial number in violation of Minn.Stat. § 609.667 (2004), and possession of marijuana in violation of Minn.Stat. §§ 152.027, subd. 4(a), and 152.02, subd. 2(3) (2004). The marijuana charge was ultimately dismissed. The charges arising from the two incidents were tried separately and in each case the jury found Courtney guilty as charged.

In a consolidated appeal, the court of appeals reversed both convictions and remanded, holding, among other things, that: (1) the admission of a videotaped interview by S.B.'s six-year-old daughter, S.G., in the domestic assault case violated Courtney's right to confrontation; (2) the error was not harmless; (3) the trial court abused its discretion when it denied Courtney's motion for a continuance in the domestic assault case to allow his new attorney more time to prepare for the trial; and (4) the trial court abused its discretion by admitting a portion of the complaint from the domestic assault case in the officer assault trial. *State v. Courtney*, 682 N.W.2d 185, 205 (Minn.App.2004). The state appealed. We granted limited review on the above issues.[1]

After briefing, but before oral argument at the court of appeals, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Relying on *Crawford*, the court of appeals, in the domestic assault case, held that Courtney's right to confront witnesses against him under the Sixth Amendment to the United States Constitution was violated when the trial court admitted into evidence a videotaped statement made by S.G., who was unavailable to testify at trial.[2] *Courtney*, 682 N.W.2d at 197. The court of appeals concluded that, if harmless error analysis applied, the erroneous admission of S.G.'s videotaped statement was not harmless. *Id.* The court of appeals further held in the domestic assault case that the trial court abused its discretion when it denied Courtney's motion for a continuance to allow his recently retained attorney more time to prepare for trial. *Id.* at 200. The court of appeals also reversed in the officer assault case, holding that the trial court erred in admitting evidence related to Courtney's domestic assault of S.B. *Id.* at 198. The court of appeals concluded that, because it had reversed the conviction in the domestic assault case, the introduction of other crimes evidence from that case impermissibly tainted the officer assault case. *Id.* The court of appeals did not perform a harmless error analysis with respect to the

1. Before oral argument, Courtney moved this court to strike the transcript of S.B.'s June 23, 2004, contempt proceeding from the appellate record. We grant Courtney's motion.

2. An issue raised at the court of appeals but not in this court addressed whether a statement S.B. gave to a police officer on September 21, 2001, was admitted in violation of *Crawford* because it was testimonial. The court of appeals concluded that the statement was properly admitted because S.B. testified at trial and was available for cross-examination. *Courtney*, 682 N.W.2d at 196. The court

of appeals went on to conclude that the statement was testimonial. *Id.* In that the statement was properly admitted because S.B. was available to testify at trial, the court of appeals did not need to determine whether the statement was testimonial. While the issue of whether S.B.'s statement to the police officer is not before us for decision, we want to make clear that whether the statement is testimonial is an open question and that this opinion should not be read as either agreeing or disagreeing with the court of appeals' ruling on that point.

admission of the other crimes evidence. *See id.*

The facts giving rise to Courtney's convictions are as follows. On September 21, 2001, Caledonia Police Chief Duane St. Mary responded to a domestic incident at S.B.'s apartment. Chief St. Mary described S.B. as in "pretty bad shape" when he arrived, with red marks along the left side of her jaw and a black left eye. The right side of S.B.'s face and upper cheek were swollen, with discoloration under her right eye and a broken blood vessel in her right eye.

Before Chief St. Mary could ask S.B. what her name was, S.B. began talking about what Courtney, the father of two of her four children, had done to her. She said that Courtney came to her apartment on Wednesday, September 19, and became upset when S.B. received a call from a man who had dialed the wrong number. As a result of this call, Courtney demanded to know who the man was. According to S.B., Courtney said if she did not tell him who the caller was he would choke the information out of her. Courtney then proceeded to choke and beat S.B. Chief St. Mary observed that the marks on S.B.'s neck were consistent with S.B. having been choked. S.B. said her neck was so swollen that she could hardly swallow. According to S.B., Courtney hit her "like [she were] a man," assaulting her in both the living room and the bedroom. The assault included grabbing S.B. by her hair, banging her head against a wall, and hitting her in the stomach and face. At some point, S.B.'s nose started to bleed, resulting in blood splatters on a bedroom wall. Afraid that Courtney was going to kill her, S.B. grabbed a knife, which Courtney took away from her and held to her throat. According to S.B., the physical assault continued on September 20, with Courtney taking S.B. into the bathroom, hitting her

head against the bathtub, and choking her until she passed out. Evidently the beating resumed and, even though S.B. did not have the phone number of the man who called, she eventually told Courtney that she would give him the phone number. She lied to Courtney because she thought if she did not give him a phone number he was going to kill her. Having been told that she was going to give him the number, Courtney stopped choking S.B. On the morning of September 21, Courtney broke S.B.'s two telephones, took some of S.B.'s belongings, and said he was going to come back and take more. He told S.B. that he would kill her if she did not open the door upon his return and that if she acted like she was not home he would shoot her.

S.B. was treated by Dr. Alan Fleischmann on September 22, 2001. She told the doctor that she had been beaten by her children's father on September 19 and 20. She also told the doctor that Courtney punched her in the face and chest and "throttled" her twice and that she thought she was going to die when he did that. In his testimony, Dr. Fleischmann described S.B.'s injuries, including a bruise to her head, a black eye, hemorrhaging in her other eye, tender jaw joints, tenderness in the rib cage, and a swollen face, as well as bruises on the left side of S.B.'s throat that were consistent with finger marks. It was Dr. Fleischmann's opinion that S.B.'s explanation of the assault was consistent with her injuries.

On October 8, 2001, Child Protection Investigator Kristi Peterson interviewed six-year-old S.G. regarding her knowledge of Courtney's assault of her mother. The interview was arranged by Chief St. Mary and was conducted in a Houston County Human Services interview room while Chief St. Mary watched on closed-circuit television.

Sometime in October 2001, S.B. applied for an order for protection against Courtney, which was evidently granted, and then was subsequently dismissed at S.B.'s request. On November 14, 2001, S.B.'s mother called the police out of concern for S.B.'s safety. As a result, three police officers went to S.B.'s apartment to check on her welfare. Officer James Stemper was talking to S.B. at the front door of her apartment when he saw Courtney leaving through the rear door. He chased Courtney down the hall and at some point, according to Officer Stemper, Courtney pointed a handgun at him. The two officers who accompanied Officer Stemper to S.B.'s apartment did not see Courtney point a gun at Officer Stemper. Courtney was eventually captured and arrested. At the time of his arrest, Courtney did not have a gun on his person, but one was found in the area. That gun had a round in the chamber and at least ten bullets in its magazine clip. While Courtney was in the squad car awaiting transport, S.B. talked to one of the officers and recanted her earlier statements about the September 19, 20, and 21 assaults.

Sometime in early 2002, Courtney drove S.B. to his attorney's office where S.B., in Courtney's presence, signed an affidavit prepared by the attorney recanting her statements to Chief St. Mary that Courtney had choked her and threatened her with a knife.

S.B. was subpoenaed by the state on November 27, 2002, to appear on December 19, 2002, at Courtney's domestic assault trial. On December 11, 2002, the prosecutor in the domestic assault case telephoned S.B. at work to talk to her about the case. She indicated that, although she could not talk then, she would call him back later. She did not do so, however. Other attempts by the prosecutor to talk with S.B. also failed. When S.B. did not appear at trial, the court granted the state's request for a continuance, held S.B. in contempt, and issued a bench warrant for her arrest. On February 11, 2003, S.B. called the prosecutor, angry that the state had continued to try to serve her with a subpoena. She indicated that she had lied to the police, was not assaulted, and that she wanted the charges against Courtney dismissed.

Courtney was appointed a public defender on November 19, 2001. On December 26, 2001, a private attorney was substituted as counsel. Courtney's trial on the domestic assault charges was set for December 19, 2002. Because S.B. did not comply with the subpoena to appear in court for the trial, the state was granted a continuance and the trial was rescheduled to January 23, 2003. On December 31, 2002, Courtney's private attorney moved for leave to withdraw from both the domestic assault and officer assault cases. On January 14, 2003, Courtney obtained a new private attorney in the officer assault case. On January 17, 2003, in light of the attorney changes, the trial court granted the defense's motion for a continuance and reset the officer assault trial to March 10, 2003, and the domestic assault trial to March 12, 2003. By Notice of Jury Trial dated January 21, 2003, Courtney was notified of the new trial date for the domestic assault case. On January 21, 2003, the court granted the first private attorney's motion to withdraw from both cases. Although the officer assault trial was scheduled for March 10, Courtney's attorney in that case requested and was granted a continuance due to the unavailability of a defense witness, and the trial was rescheduled to April 2003. Sometime during the week of March 3, 2003, Courtney obtained an attorney to represent him at the March 12, 2003, trial in the domestic assault case. Evidently Courtney did not tell the attorney that his trial was scheduled to com-

mence on March 12 until March 10. A pretrial hearing was held on March 11, during which the trial court denied a motion by Courtney to again continue the trial.

The domestic assault jury trial commenced as scheduled on March 12. At trial, over Courtney's objection, the court permitted the state to introduce S.G.'s videotaped statement because she was not available. Although the state was unsuccessful in its attempts to subpoena S.B. to appear, S.B. did appear as a defense witness on the last day of the trial. Indeed, S.B. rode to the courthouse that day with Courtney. S.B. testified that she fought with Courtney on September 19, 2001, but denied any other violence between them over the next two days. She also denied that Courtney choked her or used a knife to threaten her. Courtney also testified. He admitted throwing a stool at S.B. in self-defense, but denied hitting S.B., except to the extent necessary to protect himself from her knife attack, and denied assaulting her in the bathroom. He also denied using a knife against S.B. and choking her. Courtney was found guilty on March 14, 2003.

The officer assault trial began on April 16, 2003. Neither S.B. nor Courtney testified. Over the defense's objection, the trial court allowed the state to introduce a portion of the complaint in the domestic assault case into evidence. On April 18, 2003, the jury found Courtney guilty as charged.

## I.

■ We first consider whether Courtney is entitled to a new trial in the domestic assault case based on his claim that the admission into evidence of S.G.'s videotaped statement to the child protection investigator violated his confrontation rights under the Sixth Amendment. Resolution of this issue raises two questions: (1) whether the admission of S.G.'s videotaped statement violated Courtney's right to confront witnesses against him; and (2) if admission of the statement violated Courtney's right to confrontation, whether the error in admitting the statement was harmless. Because we are satisfied that any error in admitting S.G.'s videotaped statement into evidence was harmless beyond a reasonable doubt, we need not decide whether Courtney's confrontation rights under the Sixth Amendment were violated.

The court of appeals concluded that the admission of S.G.'s statement into evidence was error in light of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The court of appeals also concluded that the state "sorely needed" S.G.'s statement to corroborate S.B.'s pretrial statement because S.B. recanted at trial. *Courtney*, 682 N.W.2d at 197. The court of appeals held that Courtney was entitled to a new trial, noting that "the error was not harmless, if even a harmless error analysis can be reached by the state." *Id.*

■ Although the Court in *Crawford* did not discuss the applicability of harmless error analysis, it is well settled that violations of the Confrontation Clause are subject to such analysis. *United States v. McClain*, 377 F.3d 219, 222 (2d Cir.2004). For such a violation to be deemed harmless, it must be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Moreover, we also have stated that the admission of evidence at trial in violation of the United States Constitution does not automatically require reversal of the defendant's conviction and the granting of a new trial. *See State v. Juarez*, 572 N.W.2d 286, 291 (Minn.1997). The conviction may stand so long as the erroneous

admission of the evidence was harmless beyond a reasonable doubt. *Id.* An error is harmless beyond a reasonable doubt if the guilty verdict actually rendered was "surely unattributable" to the error. *Id.* at 292. When determining whether the jury's verdict was surely unattributable to an error, we examine the record as a whole. *Id.* In doing so, we consider the manner in which the evidence was presented, whether the evidence was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defense. *Townsend v. State,* 646 N.W.2d 218, 223 (Minn.2002). Evidence of the defendant's guilt is also a relevant consideration, but it is not the sole factor. *See id.* at 224.

The videotape of S.G.'s interview was played for the jury during Peterson's testimony. During the videotaped interview, S.G. told Peterson that she and her siblings were upstairs when she heard Courtney breaking "stuff" and her mother crying downstairs. She said that Courtney asked her mother to look for the phone number of the man who called earlier. She also said that the next night when she was in the living room, Courtney and her mother went in the bathroom next to the living room. She then heard "something go blom, blom, blom" and knew that Courtney was hitting her mother. She later saw her mother crying on the stairs. She did not see what went on in the bathroom because the bathroom door was closed. She denied hearing Courtney say he was going to kill her mother. She also denied seeing Courtney with a knife, but indicated that Courtney had a gun at some point. After S.G. mentioned Courtney having a gun, Chief St. Mary requested that Peterson have S.G. draw a picture of the gun.

First, we note that with the exception of her reference to seeing Courtney with a gun, S.G. told Peterson about what she heard, not what she saw. Moreover, her statement added little, if anything, in the way of detail relating to the evidence against Courtney. What she said she heard was S.B. and Courtney fighting and arguing. Although S.B. and Courtney denied fighting on September 20 and 21, they both testified that they fought on September 19. Chief St. Mary testified in detail about what he observed and was told by S.B. about Courtney's assault over the three-day period. Dr. Fleischmann also testified about his examination of S.B. and what she told him about Courtney's assault. Given the testimony of Chief St. Mary and Dr. Fleischmann, S.G.'s statement was, at most, cumulative. Further, the statement was not inconsistent in any substantive way with the testimony of either S.B. or Courtney. Therefore, we conclude that the statement was not highly persuasive.

Moreover, other than playing the videotape of the interview, the state made limited use of S.G.'s statement. In both the opening statement and closing argument, the state noted only that S.G. heard banging and cursing during the assaults. The state's only other reference to the interview occurred when Chief St. Mary was asked why S.G. was interviewed. His response was that S.G. "might be old enough to talk to." The state made no further use of the statement. On cross-examination, Courtney was able to establish that Peterson failed to follow ordinary procedures to determine whether S.G.'s statement was tainted by S.G.'s having talked personally with anyone else about what had happened, thus calling into question the value of the statement. Courtney was also able to establish that Peterson used leading questions to elicit some of S.G.'s statement. In establishing these facts, Courtney effectively countered S.G.'s videotaped

statement by undermining the statement's evidentiary value.[3]

At the same time, evidence of Courtney's guilt was strong. Chief St. Mary, who took a statement from S.B. and photographed her injuries on September 21, 2001, described in detail what S.B. told him, what he observed of S.B.'s injuries, and what the photos of those injuries showed. Specifically, he testified that S.B. said that she was "hit like a man"—very hard—and that Courtney grabbed a knife from her and held it to her throat. Chief St. Mary observed that S.B.'s neck had "red marks" that were consistent with her being choked and beaten. He also saw blood-like splatters on one side of a bedroom wall. He testified that S.B. said that she had a bloody nose from the beating and showed him the splatters, saying, "That's my blood." S.B. also said that the second night Courtney hit her head on the corner of the bathtub and dropped her head in the toilet while the children were in the living room. S.B.'s statement was consistent with Chief St. Mary's description that S.B. had a "terribly swollen" face and "a humongous black eye."

Chief St. Mary's testimony was corroborated by Dr. Fleischmann, who examined and treated S.B. on September 22. Dr. Fleischmann testified that S.B. stated that she was punched in the face and chest and was "throttled" twice by Courtney. Dr. Fleischmann observed that S.B. had a "black eye" on the left, a "fading black eye" on the right, finger marks or bruises consistent with finger marks on her neck, and other injuries. He testified that her injuries were consistent with her statement about the assaults. Given the testimony of Chief St. Mary and Dr. Fleischmann, there was strong circumstantial evidence of guilt independent of S.G.'s and S.B.'s statements. We, therefore, reject the court of appeals' conclusion that the state "sorely needed" S.G.'s videotaped statement to corroborate S.B.'s pretrial statement.

Because we conclude that S.G.'s videotaped statement was not highly persuasive, that its use was limited, that the defense was able to effectively counter the statement, and, in addition, that the evidence against Courtney was strong, we also conclude that the jury verdict was "surely unattributable" to the admission of S.G.'s statement. We hold, therefore, that any error in admitting S.G.'s videotaped statement was harmless beyond a reasonable doubt and Courtney's conviction in the domestic assault trial stands.

## II.

■■■ Next, we turn to the trial court's ruling denying Courtney's request for a continuance. We review the trial court's ruling on a defendant's request for a continuance for abuse of discretion. *See In re Welfare of T.D.F.,* 258 N.W.2d 774, 775 (Minn.1977). A defendant must show that he was prejudiced to justify reversal. *Id.*

■■■ We recognize that a defendant's constitutional right to assistance of counsel includes a fair opportunity to secure counsel of his own choice. *State v. Fagerstrom,* 286 Minn. 295, 298, 176 N.W.2d 261, 264 (1970). However, "[a] defendant may not obtain a continuance by discharging his counsel for purposes of

---

3. While S.G. mentioned seeing Courtney with a gun in her videotaped statement, it is not clear from her statement when and where she saw the gun. Courtney was not charged with possessing a gun or using a gun in threatening S.B. in the domestic assault case. Nor did the state build its domestic assault case against Courtney based on his possession or use of a gun. Therefore, we conclude that S.G.'s statement with respect to the gun had no impact on the persuasiveness of S.G.'s statement or the verdict returned by the jury.

delay or by arbitrarily choosing to substitute counsel at the time of trial." *Id.* at 299, 176 N.W.2d at 264. "The matter of continuance to permit substitution of counsel is traditionally within the discretion of the trial judge; his decision is to be based on the facts and circumstances surrounding the request." *Id.;* 176 N.W.2d at 264. A motion for a continuance is properly denied when the defendant has not been diligent in procuring counsel or in preparing for trial. *See id.* at 297–99, 176 N.W.2d at 263–64 (holding that the trial court properly denied the defendant's motion for continuance when the defendant expressed a desire to secure an attorney through the Bureau of Indian Affairs, but produced no evidence that he could have done so or that he was dissatisfied with his former attorney).

In this case, the state argues that Courtney was engaged in intentional stalling and the court of appeals' decision was contrary to the facts. The state further argues that Courtney was not prejudiced by the denial of the continuance. In response, Courtney argues that he was prejudiced because his new attorney only had one day to prepare for the domestic assault trial.

The record shows that Courtney was initially appointed a public defender. On December 26, 2001, he substituted the public defender with a private attorney, Michael York, for both the domestic assault and officer assault cases. On December 31, 2002, after working with Courtney for a year, York moved for leave to withdraw, citing as reasons that Courtney requested that he withdraw, that Courtney's lack of cooperation exceeded his worst expectation, and that Courtney failed to pay as agreed. On January 14, 2003, Richard Shane was substituted for York in the officer assault case. On January 21, 2003, York's motion for leave to withdraw from both cases was granted. The record

shows that all subsequent court correspondence relating to the domestic assault case was sent directly to Courtney. Sometime during the week of March 3, 2003, Courtney contacted Gregory Schultz to represent him in the domestic assault case. Evidently, Courtney did not tell Schultz the date set for trial until two days before the trial. A pretrial hearing for the domestic assault trial was held on March 11, during which the trial court denied Courtney's motion for a continuance. The domestic assault trial commenced as scheduled on March 12.

It is clear from the record that Courtney was aware of his difficult working relationship with York and had almost two months to secure new counsel in the domestic assault case after York withdrew, but failed to do so in a timely manner. Also, once Courtney retained new counsel the week of March 3, he failed to timely inform his new counsel about the impending trial date. While we cannot on this record say unequivocally that Courtney was engaged in an intentional effort to manipulate the domestic assault trial date, we can say that his lack of diligence in both obtaining counsel and, once having obtained counsel, his failure to inform counsel of the selected trial date was the cause of his counsel's limited preparation time. Balancing Courtney's right to counsel of his choice against the public interest of maintaining an efficient and effective judicial system, and in light of Courtney's lack of diligence, we conclude that the trial court did not abuse its discretion when it denied Courtney's motion for a continuance.

### III.

▮▮▮▮ Finally, we turn to whether the trial court abused its discretion in admitting the evidence of domestic violence in Courtney's officer assault trial. We review a trial court's decision on whether to

admit other crimes evidence for an abuse of discretion. *State v. Kennedy,* 585 N.W.2d 385, 389 (Minn.1998).

At trial, the state read the following portion of the complaint from the domestic assault case into the record:

On the evening of September 19, 2001, the defendant was at [S.B.'s] apartment at 103 North Gjere Avenue, # 5, in Caledonia. Defendant told [S.B.] that he was going to choke the truth out of her. The defendant choked [S.B.] and struck her repeatedly around the face. The defendant choked [S.B.] around the neck, causing it to be so swollen that she could hardly swallow. After defendant choked [S.B.], she ran for a knife to protect herself. When she grabbed the knife, the defendant took it from [S.B.] and held it up to her face saying that he would stab her face.

The state argues that the admission of this other crimes evidence was relevant to prove Courtney's intent to cause fear. The state further argues that there are similarities between the domestic assault and the officer assault because they were close in time and both involved Courtney's holding a dangerous weapon in a threatening position, a knife in the domestic assault case and a gun in the officer assault case. The state also argues that the other crimes evidence was necessary because Courtney's defense was his lack of specific intent to cause fear in the officer. The state finally argues that any error in admitting the evidence was harmless.

Courtney contends that his argument at trial was not his lack of intent but instead that he did not point a gun at the officer. He further argues that the state's case was not weak, that the evidence was not relevant, that the evidence was prejudicial, and

that its erroneous admission was not harmless.

 Evidence of other crimes, frequently referred to as *Spreigl* evidence, generally may not be admitted to prove the defendant's character for committing crimes, but can be admitted to show motive, intent, absence of mistake, identity, or a common scheme or plan. Minn. R. Evid. 404(b); *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965). *Spreigl* evidence can be admitted only if:

(1) notice is given that the state intends to use the evidence; (2) the state clearly indicates what the evidence is being offered to prove; (3) the evidence is clear and convincing that the defendant participated in the other offense; (4) the *Spreigl* evidence is relevant and material to the state's case; and (5) the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice.

*Kennedy,* 585 N.W.2d at 389. If it is unclear whether other crimes evidence is admissible, the benefit of the doubt should be given to the defendant and the evidence should be excluded. *Id.* In this case, the parties mainly dispute the fourth and fifth prongs of the *Kennedy* test.

 In determining the relevancy and materiality of other crimes evidence, the trial court should consider the issues in the case, the reasons and need for the evidence, and whether there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in time, place, or modus operandi. *Id.* at 390.

In this case, the state offered the other crimes evidence specifically to prove intent. In that Courtney's defense was that he did not point a gun at the officer, we fail to see the need for the state to establish his intent in pointing the gun. In the

context of these proceedings, explaining to the jury why Courtney may have pointed a gun at the officer is not probative of *whether* he pointed a gun at the officer.[4] We also fail to see how the portion of the complaint that was read into the record is relevant to the charged offense. Although the incidents were close in time and occurred at the same location, the description of Courtney's domestic assault of S.B. sheds no light on whether or why he pointed a gun at Officer Stemper. Therefore, the court of appeals was correct in concluding that the admission of the other crimes evidence was error. The court of appeals failed, however, to consider whether that error was harmless. We conclude that it was.

 When a trial court has erroneously admitted other crimes evidence, we must determine whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. *State v. Bolte*, 530 N.W.2d 191, 198 (Minn.1995) (quoting *State v. Post*, 512 N.W.2d 99, 102 n. 2 (Minn.1994)). Here, the state's witnesses testified in detail about Courtney's attempted escape and possession and use of a gun. Further, the trial court instructed the jury to limit the use of the other crimes evidence and not to convict Courtney based on that evidence. The jury is presumed to have followed the instruction. *State v. James*, 520 N.W.2d 399, 405 (Minn.1994). Finally, the state did not dwell on the other crimes evidence in its closing argument. Therefore, because we further conclude that it is not reasonably likely that the erroneous admission of the domestic assault evidence

had significantly affected the jury's verdict, we hold that the error was harmless.

Reversed.

---

4. Although not argued by the state, we note that some evidence relating to Courtney's domestic assault of S.B. may have been admissible at the officer assault trial to explain why the officers were present at S.B.'s apartment the night that the assault of Officer Stemper occurred.