**STATE of Minnesota, Appellant,**

v.

**Edward Richard KRASKY, Respondent.**

No. A04–2011.

Court of Appeals of Minnesota.

May 24, 2005.

Mike Hatch, Attorney General, St. Paul, MN; and Boyd Beccue, Kandiyohi County Attorney, C.J. Crowell, Assistant County Attorney, Willmar, MN, for appellant.

Mary M. McMahon, McMahon & Associates Criminal Defense, Ltd., Roseville, MN, for respondent.

Considered and decided by WILLIS, Presiding Judge; STONEBURNER, Judge; and CRIPPEN, Judge.

## OPINION

WILLIS, Judge.

In this pretrial appeal from an order suppressing evidence, the state argues that a victim's statements to a nurse practitioner concerning alleged sexual abuse are admissible over appellant's *Crawford* objection because the statements were not testimonial. The state also argues that the district court erred by suppressing its *Spreigl* evidence. We affirm in part, reverse in part, and remand.

## FACTS

Seven-year-old T.L.K. and her five-year-old sister, M.R.K., live with their foster parents, Tom and Sandy Houston. In April 2004, Sandy Houston suspected T.L.K. of inappropriately touching M.R.K. and asked T.L.K. if anyone had ever touched her that way. T.L.K. responded by describing acts suggesting that her father, respondent Edward Krasky, had inappropriately touched both her and M.R.K. A few days later, Houston walked in on T.L.K. intimately kissing M.R.K., apparently against M.R.K.'s will. These incidents, as well as a previous comment by T.L.K. that Krasky had licked her "all over," prompted Houston to contact the authorities.

On May 12, 2004, the Willmar Police Department received a child-protection report regarding T.L.K. and Krasky. Detective Timothy Manuel and the child-protection worker assigned to the case decided to

have T.L.K. interviewed at Midwest Children's Resource Center (MCRC). On May 20, 2004, a nurse practitioner at MCRC interviewed and examined T.L.K. Detective Manuel observed the interview and examination from another room.

During the interview, T.L.K. had difficulty focusing and gave disjointed answers that were difficult to understand. But she was able to provide more direct answers in the subsequent physical examination. In both the interview and the examination, she described several occasions when Krasky touched her with his fingers, tongue, and penis.

Krasky was charged with six counts of first-degree criminal sexual conduct, in violation of Minn.Stat. § 609.342 (2002), and six counts of second-degree criminal sexual conduct, in violation of Minn.Stat. § 609.343 (2002). After a pretrial hearing on Krasky's motions to suppress the state's evidence, the district court ruled that T.L.K.'s statements in the interview and examination were testimonial and, therefore, inadmissible under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The district court also ruled that the state's *Spreigl* evidence was inadmissible. The state appeals from the district court's order suppressing both T.L.K.'s statements at MCRC and the *Spreigl* evidence.

## ISSUES

1. Did the district court err by ordering the suppression of T.L.K.'s statements in her interview and examination at MCRC?

2. Did the district court err by ordering the suppression of the state's *Spreigl* evidence?

## ANALYSIS

### I.

■ On appeal from a pretrial order suppressing evidence, the state "must clearly and unequivocally show both that the trial court's order will have a 'critical impact' on the state's ability to prosecute the defendant successfully and that the order constituted error." *State v. Scott,* 584 N.W.2d 412, 416 (Minn.1998) (quotation omitted). "[W]hen a young child is found incompetent to testify and is thus unavailable the suppression of the child's statements describing the alleged sexual abuse reduces the likelihood of a successful prosecution and meets the critical impact test." *In re Welfare of L.E.P.,* 594 N.W.2d 163, 168 (Minn.1999). Because T.L.K.'s statements during the MCRC examination offer "an account of the events of the offense charged for which the testimony of others who were not the victim can be no substitute," we conclude that the state has met its critical-impact burden. *See id.* at 169.

■ Whether the district court erred by suppressing T.L.K.'s statements at MCRC is a question of law, which we review de novo. *See State v. Harris,* 590 N.W.2d 90, 98 (Minn.1999) ("When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence.").

In *Crawford v. Washington,* the United States Supreme Court ruled that the Confrontation Clause of the Sixth Amendment bars the admission of testimonial out-of-court statements unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. 541 U.S. 36, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). Both parties agree that T.L.K. is not competent to testify and that Krasky has not had an opportunity to cross-examine her. The district court found that T.L.K.'s state-

ments at MCRC were testimonial and concluded that those statements are inadmissible under *Crawford.*

The Supreme Court did not define "testimonial" for Confrontation Clause purposes, but it did describe three types of statements that "share a common nucleus and ... define the Clause's coverage at various levels of abstraction." *Id.* at 1364. These formulations of "testimonial" statements are:

> ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, ... extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, ... [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* (second ellipsis in original) (citations and quotation marks omitted).

▪ The statements at issue here are neither "ex parte in-court testimony or its functional equivalent" nor are they "extrajudicial statements ... contained in formalized testimonial materials." *See id.* But they may fall into the third and broadest formulation if they "were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *See id.*

We considered this third formulation of "testimonial" in *State v. Scacchetti,* 690 N.W.2d 393 (Minn.App.2005), *review granted* (Minn. Mar. 29, 2005). In *Scacchetti,* we reviewed the admission of a videotaped interview and examination of a

child-abuse victim. *Id.* at 395–97. The victim's mother took her to the emergency room after noticing blood on items of her clothing and numerous bruises on her face. *Id.* at 394. The victim was transferred to MCRC to determine if any abuse had taken place. *Id.* At trial, the MCRC director testified that the center's process for diagnosing child abuse includes an interview with the person who brought the child to the clinic, an interview in which the child is asked "historical" questions about potential abuse, and a physical examination of the child. *Id.* She testified that "the process is based on 'medical protocol'" and that although a nurse practitioner conducts the examination and interview, all examinations and interviews at MCRC are videotaped for the director's review. *Id.*

In *Scacchetti,* we observed that under the third formulation of testimonial statements described in *Crawford,* the defendant must show that "the circumstances surrounding the contested statements led the [child victim] to reasonably believe her disclosures would be available for use at a later trial, or that the circumstances would lead a reasonable child of her age to have that expectation." *Id.* at 396. We held that the statements in that case were not testimonial because the examination and interview were performed for the purpose of a medical diagnosis and the nurse conducting the examination and interview "was not working on behalf of, or in conjunction with, investigating police officers or other government officials for the purpose of developing the case against [the defendant]." *Id.* (alteration in original) (quotation omitted).

Here, T.L.K. was examined and interviewed at MCRC by a nurse practitioner using what appears to be the same procedure described in *Scacchetti.* The nurse practitioner conducted a thorough medical examination, including an STD test, and

recommended that T.L.K. see a psychotherapist to help her cope with the abuse that she has suffered. The examination was also videotaped, presumably for review by the MCRC director.

In *Scacchetti,* the circumstances under which the contested statements were given were crucial to our determination of whether the statements were testimonial. *Scacchetti,* 690 N.W.2d at 396. Here, although the MCRC examination may have been arranged by Detective Manuel and a child-protection worker, there is no indication that T.L.K. thought that her statements might be used in a later trial. T.L.K. was driven to MCRC by her foster mother, and she was shielded from the police presence throughout the MCRC examination. The record is clear that Detective Manuel did not interrupt or direct any portion of the interview or examination. The length of time between the alleged abuse and the examination also suggests that T.L.K. was not aware of any prosecutorial purpose of the examination and did not "reasonably believe that her disclosures would be available for use at a later trial." *Scacchetti,* 690 N.W.2d at 396. Although T.L.K. was not in need of immediate medical attention when the examination took place, the record shows that a nurse practitioner performed tests and asked questions so that she could provide a medical diagnosis.

Detective Manual may have anticipated that T.L.K.'s statements at MCRC might ultimately be used in Krasky's prosecution, but the circumstances under which her statements were made do not fall into any of the formulations of "testimonial" described by the United States Supreme Court in *Crawford. See Crawford,* 541 U.S. at 52, 124 S.Ct. at 1364. We find that Krasky has not shown that "the circumstances surrounding the contested statements led [T.L.K.] to reasonably believe her disclosures would be available for use at a later trial, or that the circumstances would lead a reasonable child of her age to have that expectation." *See Scacchetti,* 690 N.W.2d at 396. Although the examination was arranged by Detective Manuel, we further find that the examination was conducted, at least in part, for the purpose of medical diagnosis and that the administering nurse practitioner followed her medical protocol without interference or assistance from Detective Manuel. We conclude that T.L.K.'s statements at MCRC were not testimonial, and we reverse the district court's order suppressing those statements.

## II.

■ The state also argues that the district court erred by suppressing the state's *Spreigl* evidence. Again, we will not reverse a pretrial order suppressing evidence unless "the order constituted error." *Scott,* 584 N.W.2d at 416.

■ The state seeks to introduce evidence that in 1989, Krasky sexually assaulted his stepsister, who was then eight years old. Evidence of other crimes is inadmissible to prove bad character, but it may be allowed for the limited purpose of showing "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b). *Spreigl* evidence is admissible if the evidence of the defendant's participation in the offense is clear and convincing, the evidence is relevant and material to the state's case, and the probative value of the evidence outweighs its potential for unfair prejudice. *State v. Robinson,* 604 N.W.2d 355, 363 (Minn. 2000).

Krasky's participation in the 1989 offense is clear and convincing. But evidence of that offense has limited relevance because the circumstances of the 1989 of-

821

fense are considerably different from those of the alleged assaults here. *See State v. Kennedy*, 585 N.W.2d 385, 391 (Minn.1998) (noting that to be relevant, *Spreigl*-evidence events must "be sufficiently or substantially similar to the charged offense"). In light of our decision to reverse the district court's order suppressing T.L.K.'s statements at MCRC, the state's need for the *Spreigl* evidence is significantly reduced, and the potential for unfair prejudice outweighs the limited probative value of the evidence. *See State v. Berry*, 484 N.W.2d 14, 17 (Minn.1992) ("[W]hen balancing the probative value of *Spreigl* evidence against the potential for unfair prejudice, the trial court must consider how necessary the *Spreigl* evidence is to the state's case.").

The district court suppressed the state's *Spreigl* evidence because it determined that the state failed to show that the evidence is material, relevant, or probative. It also noted that the evidence is not relevant because the *Spreigl* offense occurred more than 15 years ago. We agree and conclude that the district court did not err by suppressing the state's *Spreigl* evidence.

## DECISION

Because T.L.K.'s statements were given to a nurse practitioner in circumstances that did not lead her, and would not lead a reasonable child of her age, to believe that the statements would be available for use at a later trial, her statements are not testimonial and are, therefore, admissible. But the state's *Spreigl* evidence is inadmissible because the evidence lacks relevance

and because the state has not shown that the evidence is necessary to its case.

**Affirmed in part, reversed in part, and remanded.**

CRIPPEN, Judge * dissenting.

CRIPPEN, Judge (dissenting).

I respectfully dissent. The state's challenge to the district court's suppression of out-of-court statements suggests a judicial assumption that medical personnel will conduct pretrial investigative interviews with impartiality, with concern only for health care—that this promise trumps another's fundamental constitutional right to cross-examine those who testify against him. This plea contradicts a skepticism about crime investigators that is deeply embedded in the Constitution. *See infra*, n. 4. Although the state nominally premises its challenge on a reading of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), it adds critical elements to the *Crawford* holding and omits others. The appeal is without merit.

The central premise of *Crawford* is not disputed. Reviewing the events that prompted the Confrontation Clause, a history of patterned misuse of out-of-court "testimonial" statements, the Court criticizes and dismisses any notion that these statements can be admitted under the law of evidence based on their reliability. *Id.* at 1364, 1369–74; *see State v. Courtney*, 682 N.W.2d 185, 195 (Minn.App.2004) (synopsizing *Crawford* when reversing admission of child's statement; quoting Supreme Court observation on vital importance of right to cross-examine witnesses), *rev'd on other grounds*, 696 N.W.2d 73 (Minn. 2005).[1] Without warrant, the state propos-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. When reviewing *Courtney*, the supreme court declined to consider the question whether the child's statement was erroneously admitted in the aftermath of *Crawford*. *State v. Courtney*, 696 N.W.2d 73, 77 n. 2, 79 (Minn.2005). Because the statement dealt with an offense against the child's mother, to

es to excise from the scope of *Crawford* the critical topic of pretrial interrogations that public investigators delegate to medical personnel.

There are three flaws in the state's challenge to the district court's decision. First, the holding of *Crawford* and the rationale stated to support it do not permit a constrained construction of out-of-court testimony that excludes interrogations delegated to others by public officials charged with the responsibility to investigate criminal conduct. Second, the state's appeal is premised on a serious misreading of *Crawford* as it bears on the understanding of a declarant that her statements will later be used at trial. Finally, the state's approach strips from *Crawford* its central vitality in announcing the need for judicial protection of a "bedrock procedural guarantee." 124 S.Ct. at 1359.

## I. Pretrial Questioning

The Confrontation Clause, the *Crawford* Court states, applies to witnesses against the accused—"in other words, those who 'bear testimony.'" *Id.* at 1364. As the state observes, the Court leaves "for another day" a "comprehensive" definition of testimonial statements. *Id.* at 1374. This is the Court's prefatory remark to its final statement of the law of the case, but the remainder of this statement is equally striking.

In its ultimate holding, wrapping up its opinion and its review of the meaning of testimonial statements, the Court declares: "Whatever else the term covers," it applies "at a minimum" to prior testimony at a preliminary hearing and to police interrogations. *Id.* at 1374. And the Court states its rationale for reciting these two forms of testimony. "These are the mod-

ern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* The first, ex parte testimony at a preliminary hearing, qualifies as testimonial "under any definition" of the concept. *Id.* at 1364. The other, police interrogations, also qualifies "under even a narrow standard," which the Court does not call for. *Id.*

The judicial challenge created by *Crawford* is to identify what is not "minimum," what is not "narrow[ly]" stated, what might not be considered "under any definition" of the concept. The Court makes it evident that the two stated occasions of testimony, examinations by magistrates and police, are not the "comprehensive" form of testimonial events that will be stated on another day. It may exaggerate to suggest that these two occasions are a mere foretaste of the full picture of testimonial events, but it is no less extreme to imagine that only the two incidents recited by the *Crawford* Court are within the category.

To begin the discussion of out-of-court testimony, the Court observes that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 1364. It does not follow, of course, that all accusations other than a casual remark to an acquaintance are testimonial. But, here again, the Court's rationale makes it equally evident that testimonial statements are not confined to a formal statement "to government officers."

The accusatory statements of suspected child abuse victims, taken in settings selected by public officials and elicited by

which the child was not an eyewitness and which was proven by better evidence, any error in admitting the statement was held harmless. *Id.* at 79–80. Unlike *Courtney,* the

district court in this case decided against admitting the statement; the state's case rests on the proposition that the issue critically affects the state's ability to prosecute the case.

persons trained for these interviews, cannot be reasonably excepted from the scope of *Crawford.* This conclusion on the more complete picture of testimonial statements is deducted from the ultimate holding of *Crawford,* just stated and discussed, and from the following added suggestions of the *Crawford* Court.

## A.  Investigative Function

When reasoning that dangers first perceived in statements to magistrates were later evident in police interviews, the *Crawford* Court speaks of police as the officials now performing "the investigative functions" once associated with magistrates. *Id.* at 1365. "The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace." *Id.* And again, the Court declares: "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar." *Id.* at 1367 n. 7.

Reasonably, even inescapably, this express concern of the *Crawford* Court extends to the modern widespread use of pretrial statements in child abuse prosecutions.  In this instance, the public has created another cadre of personnel to complete "the investigative functions" once associated with magistrates and police.  The risks are no different in this case than in a case of careful interviewing by police.

Initially at least, and by law in Minnesota and elsewhere, the investigating function in child abuse matters rested with police and social service personnel, who were to coordinate their efforts when either received a report of abuse.  *See* Minn.

Stat. § 626.556, subd. 3(a) (2004) (setting out persons mandated to report and to investigate).  When abuse reporting laws were first enacted, it was anticipated that medical agencies would be among those reporting discovery of abuse.  *Id.,* subd. 2. We are now confronted by the reality that police and social service investigators turn to medical agencies as primary agents to conduct their investigations.

As medical professionals conduct interviews on behalf of police and social service agents, it requires a high preference for form over substance to overlook the fact that they approach the task mindful that the state agents who arranged for their efforts also depend on them to produce evidence, monitor their efforts, and no doubt evaluate their services.  It becomes unquestionably evident that the interviewers share with the officials the desire that evidence of criminal conduct be uncovered for later proceedings.  In this case, as correctly recited by respondent,

> [t]he case was turned over to Detective Timothy Manuel for investigation.  Det. Manuel spoke to the Child Protection Worker who was assigned to the case and the two of them decided that the best way to proceed with the investigation was to have Midwest Children's Resource Center do an interview with TLK. The examination was set up for May 20, 2004.... A copy of the [interview] report ... was sent to Det. Manuel's attention.  The interview was video-recorded and Det. Manuel received a copy of that videotape.[2]

As in *Courtney,* where interviewers were monitored by police, 682 N.W.2d at 190–91, the interviewers in this case were monitored by two Kandiyohi County social service employees watching from an observation room.  The circumstances in both

**2.**  Inexplicably, these facts are omitted from the state's recitation of facts and its argument.

cases prompt what we deduced there, that the interviews were conducted "for the purpose of developing" and in "preparation" of the state's criminal case. *Id.* at 196.

The special training of "medical" interrogators, however beneficial to the ultimate welfare of the child, makes them no less interested in the prosecution of suspected crimes. Nor are they less able than other interviewers to use the pretrial setting in a fashion that differs from what would occur if the witness were cross-examined as provided by law. The interviews we review demonstrate the "[i]nvolvement of government officers in the production of testimony with an eye toward trial," and they present "unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar." *Crawford,* 124 S.Ct. at 1367 n. 7.[3]

No doubt there may be cases where medical personnel do not act for the state, creating circumstances that are substantially different from conduct of persons anticipating a prosecution. *See State v. Jorgensen,* 660 N.W.2d 127, 131 (Minn. 2003) (recognizing that constitutional protections do not extend to independent conduct of private persons). But those cases do not turn on the employment of the actor; rather, they are based on an assessment of the degree of government involvement in the action. In proposing admissibility of pretrial interviews that skirt the right of an accused person to cross-examine the witness, like attention is required to the extent of governmental involvement. *See* Heather L. McKimmie, *Repercussions of* Crawford v. Washington: *A Child's Statement to a Washington State Child Protective Services Worker May be Inadmissible,* 80 Wash. L.Rev. 219, 240–43 (2005) (student-authored analysis).

Accordingly, the case we review may be distinguished from hospital examinations of children receiving emergency care. *See State v. Scacchetti,* 690 N.W.2d 393, 394 (Minn.App.2005) (reviewing interviews, like those in this case, by staff of Midwest Children's Resource Center, which is department in hospital), *review granted* (Minn. Mar. 29, 2005). Medical-services situations of that kind are unlike those where interviewers patently act at the behest of police or social service investigators.

### B. *Neutrality, Reliability*

Adding to the statement that an improper testimonial event arises upon "[i]nvolvement of government officers production of testimony," the court declares that this would be no less so if "neutral" government officers were involved, which the trial court in *Crawford* had found to be the case for questioning by law enforcement officers in the circumstances of that case. *Crawford,* 124 S.Ct. at 1373. "The Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers." *Id.*

---

**3.** Although police involvement in the case at bar is not mentioned, the state deems it important to report that a medical interviewer in this case stated to the declarant "several times that the answers were needed so that [the interviewer] would know what to do to keep T.L.K.'s body healthy." This observation is significant to show the medical relevance of the declarant's answers, but it also demonstrates the medical interviewer's sensitivity to legal standards governing the admissibility of evidence at trial. *See United States v. Beaulieu,* 194 F.3d 918, 921 (8th Cir.1999) (stating pre-*Crawford* rule of admissibility requiring that medical interviewer "makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment").

These statements rebut the notion that the interviewers in this case are different because they are in the medical community or are specialists. Moreover, the suggestion of neutrality from these agents is little more than a claim that statements they produce are more reliable than others, the standard emphatically rejected by the *Crawford* Court.

## C. Historic Comparisons

When the Court speaks of police interrogations, it notes that they have the "closest kinship" to the abusive use of out-of-court-statements in English and colonial history, which began with pretrial questioning by magistrates and was later expanded to include pretrial interrogation by police. *Id.* at 1374.

We cannot be unaware that prosecutions for the interests of children are a major element of modern criminal justice and are the occasion for a form of pretrial interrogation that has close kinship with the pretrial statements more evident in prior stages of the anglo-American history of the criminal law.

## D. Questioning Witnesses

The Court clarifies in a footnote that its use of the term "interrogation" is in its "colloquial" sense and not its "technical legal" sense. *Id.* at 1365 n. 4. Although "structured police questioning," which occurred in *Crawford*, is included "under any conceivable definition," the Court has no occasion to further define the ordinary, colloquial (conversational?) concept of interrogation. *Id.* at 1364. The reasonable scope of interrogation, in a colloquial sense, includes the questioning by medical personnel which is aimed at determining whether a criminal accusation will be stated.

## E. Oral Testimony

When discussing its proposition that prior cross-examination is the only basis for admitting a testimonial statement, the *Crawford* Court notes a possible misunderstanding. Most of the hearsay exceptions that were cited in the past to permit admitting a statement without prior cross-examination, the Court declared, "were not testimonial—for example, business records or statements in furtherance of a conspiracy." *Id.* at 1367. (The Court notes that dying declarations may be an exception to the commonly defined right of confrontation.) The Court's observation casts doubt on permitting evidence on a pretrial oral declaration, even in pre-*Crawford* cases.

## II. Expectations of Declarant

*Crawford* declares that two, not three, forms of interviewing represent the minimum scope of what is testimonial. As set forth earlier, the Court's ultimate holding is confined to the principle that testimonial statements at least include those taken in preliminary examinations and in police interrogations. Imagining that the Court stated a third standard, the state would disregard what has been said here, the declared "minimum" ingredients of "testimonial," the "comprehensive" picture yet to be spelled out, and the several parts of the *Crawford* Court rationale that considerably assist us in understanding the characteristics of testimonial statements.

The state contends that the *Crawford* Court "did give various examples" of testimonial evidence, "including" not only preliminary hearings and police interrogations, but also "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Going further,

[i]t is the State's position that when attempting to assess whether the declarant's out of court statement is "testimo-

nial," the *Crawford* Court directs us to stand in the shoes of that person at the time he or she makes the statement.

. . .

It is through her eyes, as the declarant, that this court must view her statements.

. . .

[And, t]his little girl, T.L.K. could not reasonably expect that her statements would be used prosecutorially.

A considered reading of *Crawford* supports its announcement of two "minimum" forms of pretrial testimony, preliminary-hearing testimony, "under any definition," and police interrogations, "under even a narrow standard." *Id.* at 1364, 1374. The court did not adopt a third minimum form of pretrial testimony or make any statement to contradict its ultimate announcement that it left "for another day" its own formulation of a definition beyond the two examples cited. *Id.* at 1374. Although the state's notion of a third standard is not uncommon in opinions premised on a reading of *Crawford,* the proposition has no basis in the relevant language employed by the Court.

And the state's argument goes further, making it even more problematic. The declarant's understanding is asserted as a complete substitute for the "comprehensive" view of testimonial statements expressly envisioned in *Crawford.* The state treats the purported third variety of testimony as the maximum variety of testimonial settings. The proposition creates a limitation, a ceiling that unreasonably contradicts what the *Crawford* Court said about testimonial statements. *See Scacchetti,* 690 N.W.2d at 396 (similarly reciting that appellant "must show, under *Crawford,*" that declarant "reasonably believe[d] her disclosures would be available for use at a later trial, or that the circum-

stances would lead a reasonable child of her age to have that expectation").

Mistakes in this prosecution argument unfold in layers.

### A. A Third Standard?

First, commenting on a useful definition of pretrial testimony, the Court contrasts "a formal statement to government officers" and "a casual remark to an acquaintance." *Crawford,* 124 S.Ct. at 1364. And the Court, based principally on suggestions of counsel in the case, makes these initial comments on possible composition of a definition:

Various formulations of this core class of "testimonial" statements exist: [a] *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [b] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [c] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]

*Id.* (citations omitted). These formulations, the Court notes, "all share a common nucleus and then define the Clause's coverage at various levels of abstraction." *Id.*

Although these comments make it evident that discussions of the topic may include references to the declarant's beliefs or expectations, at least one formulation (the second) does not contain the reference, and the remainder of the opinion makes evident that this understanding is not a concept endorsed by the Court.

First, this recitation follows a lengthy Court discussion of historic abuses in the form of questioning by magistrates and police. *Id.* at 1359–64. Second, the recitation is immediately followed by further discussion of police interrogations. *Id.* at 1364–65. And finally, after denouncing prior permissive admission of pretrial statements under rules of evidence, the Court holds that the "minimum" forms of pretrial testimony, statements taken by magistrates and police, rests on identifying "the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 1374. In my opinion, *Crawford* does not judge that the declarant's understanding determines what is testimonial, singularly or as one of three standards.

## B. *Exclusive Standard?*

As already stated, there is no cause to attribute to *Crawford* a three-pronged or even a two-pronged test to determine whether a statement is testimonial. The Court's holding is expressly in terms of what are minimum standards. And the Court's opinion makes it evident that the more comprehensive picture of testimonial statements should include the major category of pretrial statements in child abuse cases.

This view is confirmed by examining the source of the briefing in *Crawford* and, more particularly, the amicus brief that accounts for the Court's mention of a "formulation" of "testimonial" that considers the expectations of the declarant. When briefing this statement, amicus cites as a source an article by Professors Richard Friedman and Bridget McCormack. Richard D. Friedman & Bridget McCormack, *Dial-in Testimony*, 150 U. Pa. L.Rev. 1171 (2002). The authors introduce the notion that the declarant's known use of the statement makes it testimonial of what the declarant anticipates, *id.* at 1240, but they make evident the same thought the *Crawford* Court expresses—that this is a minimum measure of what is testimonial. In their words, statements made knowingly to authorities that describe criminal activity are "almost always" testimonial, but other descriptions of criminal wrongdoing by a claimed victim are "usually" testimonial, "whether made to the authorities or not." *Id.* at 1241 n. 276.

## C. *Declarant's Beliefs?*

And there is still more mischief in what the state argues. What meaning is to be attributed to the concept advanced by counsel at some stage of briefing in *Crawford*, that courts examine what a declarant "expects" or "believes"? Erroneously, in my opinion, the state contends that this calls for determining the level of a declarant's insight into the practices of interrogators, prosecutors, and courts. Few small children, even if questioned by a uniformed officer or a robed judge, would understand that a prosecution and a trial lie ahead; if this is true, the state's misconstruction of *Crawford* wipes from application that which we know today is a major category of testimony taken before trial. *See Scacchetti*, 690 N.W.2d at 396 (reporting appellant's failure to show that circumstances of interrogation "led the three-year-old to reasonably believe her disclosures would be available for use at a later trial").

Initially, the notion of an inquiry on the sophistication of the declarant might reasonably be abandoned due its inevitable absurdity. The supposed standard leads to questions whether pretrial questioning is problematic if a police officer wears no uniform, or wears a costume to hide his or her identity. What if the investigating official merely asks the assistance of a private person who is trained in interroga-

tion? If the official and the victim are in a medical facility, is the occurrence of testimony avoided by asking that a doctor or nurse conduct the questioning?

And again, *Crawford* gives us some help. When reporting what counsel has suggested as a formulation of what is testimonial, *Crawford* does not endorse these suggestions as determinative; it does not "direct us," as the state suggests, to consider whether a declarant makes a statement she doesn't "reasonably [expect] to be used prosecutorially." 124 S.Ct. at 1364. But, when discussing the facts of the case reviewed in *Crawford,* the Court notes the error in admitting statements because they were taken by a neutral government officer; and the Court declares that only cross-examination could show the witnesses "perception of her situation." *Id.* at 1373.

Professors Friedman and McCormack offer a pre-*Crawford* discussion of what constitutes "the giving of testimony." Friedman, *supra* at 1240–41. The topic is generally considered one of determining when a person is "acting as a witness." *Id. at* 1240. And the authors stop once to observe what might not be testimonial, given that any description of a crime "is usually testimonial, whether made to the authorities or not." *Id.* at 1241 n. 276. The category of non-testimonial statements, in their opinion, most prominently includes "a statement made in the course of going about one's ordinary business." *Id.*[4]

### D. Worthy Purpose?

To still further enlarge this issue, the state adds another layer of argument, the

suggestion that statements are not given in a testimonial fashion when they are taken for some other purpose. The state asserts that there was evidence of a valid medical purpose for the interview that is at issue in this case. But this argument also fails to carry weight.

Even if a worthy purpose is shown, this does not show the absence of other purposes. Quite evidently, in child abuse interviews, however important for medical aims, there is a second purpose to prepare for prosecution of criminal charges, a purpose that calls for scrutiny regarding the defendant's right of confrontation. It is not reasonable to expect that a police interrogation is less problematic when the officer has a proven motive to stop a pattern of crimes, even to save lives. Nor does a magistrate's questioning become non-testimonial upon demonstration of this official's impartiality or specific pursuit of truth. Nor is it reasonable to suggest that there is no trial preparation because an officer arranges for questioning by clergy, or a teacher, or another who might serve the intended purpose of gathering evidence while acting with strong motives, among others, to help the child or the child's family.

And a primary concept of constitutional law underlies the state's error when it endeavors to capitalize on the worthy purposes of a professional interviewer: The identification of motives of any interviewer who knows the prospect of a prosecution should not be undertaken. As observed in the introduction of this opinion, liberties

---

4. The authors add a category of non-testimonial statements that begs for interpretation, a statement made "with no recognition that it relates to criminal activity." Friedman, *supra* at 1241 n. 276. It profits us little to get deeply into an interpretation of this more remote authority, but given the difference the

authors enunciate between statements made with or without expectation the statement will be used at trial (the former "always" being testimonial), it is most plausible to see this non-"recognition" category as one where the witness does not understand that the statement deals with wrongful conduct.

under the Constitution are not safely suspended on the promise that those who serve the public interest will do so impartially. The *Crawford* Court expressly reasserts this view, explaining that the Constitution's framers were even dissatisfied with the promise of judicial impartiality.[5]

### III. Upholding *Crawford*

*Crawford* does not put before us a mere technicality stated in a modern interpretation of constitutional liberties. The Confrontation Clause, as the Supreme Court restates in *Crawford,* is a "bedrock procedural guarantee." 124 S.Ct. at 1359. The singular root of the clause, the Court observed, was the right of cross-examination, *id.* at 1360–61, a practice rule which has been and remains one of "vital importance" as a result of abusive use of pretrial statements. *Id. at* 1361. The Court's holding is stated as an "absolute bar" to admission of testimonial statements without prior cross-examination. *Id.* at 1370. This declaration on the import of cross-examination sheds special light on efforts to narrow application of the Confrontation Clause to accommodate varieties of out-of-court interviews conducted in anticipation of criminal proceedings.

The historic practices that the Court reviews, first evident in England and then in the American colonies, consisted of reading pretrial statements as evidence in trial, *id.* at 1359–63, practices which had become routine in criminal prosecutions. *Id.* at 1360. In a later time, the widespread practice of pretrial interviews of children in child abuse prosecutions is a matter of "routine" that now sits prominently on the table when discussing pretrial interrogations of any kind. The implications of this case are not confined to the single interview we are reviewing in this case. The decision to broadly treat medical interviews of young children as non-testimonial wipes from the scope of the Confrontation Clause a substantial category of pretrial interrogations that are a regular part of current law enforcement practice.

As often as not, the interviewers, acting prior to criminal proceedings, declare and no doubt sincerely believe that they are engaged in a fair and just pursuit of the facts. That is the case here. But this posture is little more than a claim that the process is reliable, so reliable that it rivals the value of cross-examination. This is the claim explicitly denounced in *Crawford.* Reliance on reliability involves, the Court says, the "unpardonable vice" of admitting "core testimonial statements that the Confrontation Clause plainly meant to exclude." *Id.* at 1371. To permit these statements as "obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." *Id.; see Courtney,* 682 N.W.2d at 195 (highlighting this *Crawford* Court observation).[6]

---

**5.** "We have no doubt that the courts below were acting in utmost good faith when they found reliability. The Framers, however, would not have been content to indulge in this assumption. They knew that judges, like other government officers, could not always be trusted to safeguard the rights of the people.... They were loath to leave too much discretion in judicial hands." *Crawford,* 124 S.Ct. at 1373.

**6.** Concern about admitting statements in this case is still further enlarged by exploring, as

has not been appropriate under *Crawford,* whether the challenged statements were reliable under pre-*Crawford* standards. *See United States v. Sumner,* 204 F.3d 1182, 1185 (8th Cir.2000) (determining medical interview unreliable without interviewer's discussion of why questions were important to diagnosis and treatment "and why it was important for the child to tell the truth regarding the identity of the abuser"); *State v. Salazar,* 504 N.W.2d 774, 777 (Minn.1993) (hinging admissibility on showing that child knew she was speaking to medical personnel "and that it

The district court's application of the Constitution, as often is the case, taxes an important public interest. As has been said in this opinion, it is evident that out-of-court interviews of young victims have become a routine part of a widespread and laudable vigilance in prosecuting those who abuse children. It remains our responsibility to declare what is well established, that the pursuit of this vital public interest must be within the confines of compelling constitutional guarantees for the accused. This leaves to the prerogatives of others, as we must, the task of advancing the protection of children within constitutional limits.

Because, in my opinion, the decision to reverse the district court constitutes a far-reaching and unwarranted rejection of the fundamental implications of the Confrontation Clause, I respectfully dissent. And, because our disposition of the state's claims on *Spreigl* evidence rests on admitting out-of-court statements, my contrary position on those statements would also require a different analysis of the *Spreigl* issue.

was important she tell the truth") (citing *Ring v. Erickson*, 983 F.2d 818, 820 (8th Cir.1992)). The record shows that interviewers repeated to the child that her answers were needed so that the interviewer would know what to do to keep the child's body healthy. The record otherwise does not show a discussion of the need for the child's truthfulness. Viewing the question more broadly, the record leaves room for concern about the child's prospective motive to fabricate. *See Sumner*, 204 F.3d at 1186 (discussing "trustworthiness" in terms of child's lack of motive to fabricate).